FILED
United States Court of Appeals
Tenth Circuit

June 29, 2022

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENNTH CIRCUIT

---

GEOMETWATCH CORP., a Nevada corporation,

    Plaintiff Counter Defendant - Appellant,

v.

ROBERT T. BEHUNIN, an individual; CURTIS ROBERTS, an individual; SCOTT JENSEN, an individual; ALAN E. HALL, an individual; ISLAND PARK GROUP OF COMPANIES, a Utah limited liability company; TEMPUS GLOBAL DATA, a Delaware corporation,

    Defendants - Appellees,

UTAH STATE UNIVERSITY ADVANCED WEATHER SYSTEMS FOUNDATION, a Utah corporation; UTAH STATE UNIVERSITY RESEARCH FOUNDATION, a Utah corporation, d/b/a Space Dynamics Laboratory,

    Defendant Counterclaimants - Appellees,

and

UTAH STATE UNIVERSITY, a state university; ERIN HOUSLEY, an individual; MARK HURST, an

No. 19-4130

individual; DEBBIE WADE, an
individual; BRENT KELLER, an
individual,

      Defendants,

v.

DAVID CRAIN,

      Third-Party Defendant.

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 1:14-CV-00060-JNP)**

---

James E. Magleby (Peggy Tomsic, Adam A. Alba, Yevgen Kovalov, with him on
the briefs), Magleby Cataxinos & Greenwood, Salt Lake City, Utah, for Plaintiff-
Appellant.

David W. Tufts (David L. Arrington and Matthew J. Orme, with him on the brief),
Durham Jones & Pinegar, Salt Lake City, Utah, for Defendants-Appellees Alan E.
Hall, Tempus Global Data, Inc., and Island Park Group of Companies, LLC.

Joshua D. Davidson, Assistant Utah Solicitor General (Peggy E. Stone, Assistant
Utah Solicitor General with him on the brief), Utah Attorney General's Office,
Salt Lake City, Utah, for Defendants-Appellees Utah State University Research
Foundation, Robert T. Behunin, and Curtis Roberts.

Beth J. Ranschau, Ray Quinney & Nebeker P.C. (Arthur B. Berger, Ray Quinney
& Nebeker P.C. and Ryan B. Bell, Kunzler Bean & Adamson, P.C. with her on
the brief), Salt Lake City, Utah, for Defendants-Appellees Utah State University
Advanced Weather Systems Foundation and Scott Jensen.

---

Before **HOLMES** and **KELLY**, Circuit Judges, and **LUCERO**, Senior Circuit
Judge.

2

**HOLMES**, Circuit Judge.

Plaintiff-Appellant GeoMetWatch Corporation, ("GMW") appeals from several district court orders granting summary judgment to Defendant-Appellees Alan Hall, Erin Housley, Brent Keller, Mark Hurst, Debbie Wade, Island Park Investments, and Tempus Global Data, Inc. (collectively, the "Hall Defendants");[1] Utah State University Advanced Weather Systems Foundation ("AWSF") and Scott Jensen (collectively, the "AWSF Defendants");[2] and Utah State University Research Foundation ("USURF"), Robert Behunin, and Curtis Roberts (collectively, the "USURF Defendants").[3]

The instant lawsuit was borne out of the collapse of a venture GMW entered into that was created for the purpose of constructing and deploying a

---

[1] Mr. Hall is an individual who was previously connected to GMW's failed joint venture at issue here. *See* Hall Defs.' Resp. Br. at 14, 29. Ms. Housley, Mr. Keller, Mr. Hurst, and Ms. Wade are alleged to be "members of Mr. Hall's team." *GeoMetWatch Corp. v. Hall*, No. 1:14-00060-JNP, 2018 WL 6240991, at *5 n.7 (D. Utah Nov. 27, 2018).

[2] Mr. Jensen "is an aerospace engineer and AWSF's former director who spent 20 years building his career at [Utah State University ("USU")] and its subsidiary foundations," including Utah State University Research Foundation or USURF, which is another defendant-appellee in this appeal. AWSF Defs.' Resp. Br. at 1.

[3] During the time of the relevant events, Mr. Roberts was the "Senior Associate Vice President for Commercialization and University Advancement at USU," while Mr. Behunin was the "Vice President for Advancement and Commercialization." USURF Defs.' Resp. Br. at 5–6.

satellite-hosted weather sensor system.  GMW describes this as a "trade secrets" case, alleging that all Defendants, led by Mr. Hall, conspired to drive GMW out of business on the eve of this successful and groundbreaking weather forecasting venture by stealing its confidential and trade secret information, forming a competing business, and pulling out of agreements that Mr. Hall made with GMW.

The district court granted summary judgment to the Hall Defendants on an array of claims.  That judgment was primarily based on an overarching deficiency in GMW's case, namely, a lack of non-speculative and sufficiently probative evidence of a causal nexus between Defendants' alleged bad acts and GMW's asserted damages.  The court also granted summary judgment in favor of USURF, AWSF, and Mr. Roberts because they are allegedly immune from lawsuit under the Utah Governmental Immunity Act ("UGIA").  Subsequently, the court granted summary judgment to Mr. Jensen and Mr. Behunin on all claims, concluding generally that GMW's showing of causation also was deficient as to them.  The court likewise awarded partial summary judgment to AWSF on its breach-of-contract counterclaim against GMW, effectively denying GMW's cross-motion for summary judgment and affirmative defenses.

GMW avers that the district court's decisions were all made in error, raising three issues on appeal: First, whether the district court erred by granting summary judgment to the Hall Defendants based on GMW's lack of

non-speculative causation evidence; second, whether the court erred by granting summary judgment to USURF, AWSF, and Mr. Roberts on the basis of governmental immunity under Utah law; and third, whether the court erred by granting partial summary judgment to AWSF on its counterclaim and by denying GMW's cross-motion for summary judgment. We conclude that GMW's arguments are either unpreserved or unavailing. As a result, we **affirm** the district court's decisions.

## I

## A

This suit stems from the failed development of a weather-detecting satellite sensor system. One of the players in this failed venture, USURF, developed a weather system sensor called the Geosynchronous Imaging Fourier Transform Spectrometer—or the GIFTS sensor—in the early 2000s. The GIFTS sensor was funded by the National Aeronautics and Space Administration ("NASA") and the National Oceanic and Atmospheric Administration ("NOAA"). It possessed the ability to provide high-resolution atmospheric data that could be used to improve weather forecasting.

In 2008, David Crain and Gene Pache founded GMW, a Nevada corporation, with a vision of employing sensors like GIFTS to provide proprietary weather data for sale. To this end, GMW discussed building a commercial version of the GIFTS sensor with USURF. USURF eventually agreed to build

this commercial version, which was called the Sounding and Tracking Observatory for Regional Meteorology—or the STORM sensor. GMW and USURF thus entered into a Preferred Service Provider Agreement ("PSPA") to put onto paper their agreement. Along the way, GMW obtained a verbal commitment from NASA that GMW could have the GIFTS sensor—and, in September 2010, GMW became the first company to obtain a remote sensing license from NOAA, which would allow GMW to operate up to six GIFTS or STORM-type sensors in orbit and commercialize the resulting weather-related data.

GMW sought out potential customers for data gathered from the STORM sensor throughout 2011. GMW was largely unable to secure firm purchase commitments. The only agreement it entered into, beyond letters of intent, was a non-binding License and Services Agreement with a Chinese data company. But while this Agreement reflected a willingness on the Chinese company's part to purchase $8.9 million worth of weather data per month, the contract the company eventually entered into with GMW only obligated it to purchase a significantly lower amount: $300,000 worth of weather data per month.

In early 2012, GMW began discussions with AsiaSat, a Hong Kong-based foreign entity in the business of operating commercial satellites. The discussions concerned AsiaSat hosting the STORM sensor on its AsiaSat 9 satellite. Significantly, the parties discussed the possibility of AsiaSat using its balance

6

sheet to secure a loan of roughly $170 million from the Export-Import Bank

("EXIM Bank").  GMW would then use the loan proceeds to build the STORM

sensor.

The EXIM Bank "provides financing to *international* borrowers who buy

export goods from the United States."  *GeoMetWatch Corp. v. Hall*,

No. 1:14-00060-JNP, 2018 WL 6240991, at *2 n.4 (D. Utah Nov. 27, 2018)

(emphasis added).  The bank therefore could not structure a loan where GMW

would be the borrower because it was a domestic entity; AsiaSat, as the foreign

entity, would need to submit the loan application and be the borrower.  This

arrangement, however, would expose AsiaSat to significant potential financial

liability given the high costs of the STORM project.  *See id.* at *2 ("AsiaSat was

concerned about its 'exposure' in doing a deal with [GMW] . . . . [and] was

worried that it would take out a loan with EXIM Bank, [GMW's] business would

fail, and AsiaSat 'would be on the hook to pay off the debt.'").

On April 3, 2013, GMW and AsiaSat executed a formal Cooperation

Agreement, which reflected some of AsiaSat's concerns regarding the EXIM

Bank's loan process.  Under the Cooperation Agreement, GMW was required to

meet two conditions before AsiaSat was required to seek out a loan with the

EXIM Bank: (1) provide a guarantee, or "backstop," and (2) provide a

Convertible Note.  Section 2.2.1 of the Cooperation Agreement outlined these

conditions precedent:

**2.2.1 Conditions to Obligations of AsiaSat** . . . . The obligations of AsiaSat . . . to consummate the transactions contemplated by this [Cooperation] Agreement shall be subject to the fulfillment or AsiaSat's . . . waiver of each of the following conditions: . . .

(b) AsiaSat . . . shall have received from GMW the Convertible Note duly executed by an authorized officer of GMW, which Convertible Note shall be in full force and effect on the Effective Date;

(c) AsiaSat . . . shall have received legally valid and binding guarantees and/or other credit support (including letters of credit) in favor of AsiaSat . . . given by a guarantor (or bank, in the case of letters of credit) acceptable to AsiaSat . . . in [its] sole and absolute discretion and, in each case, in form and substance satisfactory to AsiaSat . . . in [its] sole and absolute discretion, which shall guarantee the full performance and payment of the obligations of GMW . . . .

Aplt.'s App., Vol. 13, at 2868 (Cooperation Agreement between AsiaSat and GMW, dated Apr. 3, 2013).  Under Article 15.1.1(g) of the Cooperation Agreement, AsiaSat could terminate the agreement "at any time after the Cut-off Time"—i.e., July 31, 2013—"by written notice to GMW, if the conditions set forth in Article 2.2.1 . . . [were] not fulfilled on or prior to the Cut-off Time." *Id.* at 2895.  The Cut-off Time also could be modified by a written agreement between the parties.

The guarantee, or "backstop," in Article 2.2.1(b) was intended to protect AsiaSat's financial interests in the event GMW would be unable to pay off the loan, and it was a critical facet of AsiaSat's agreement and relationship with GMW.  *See GeoMetWatch*, 2018 WL 6240991, at *2; *see also id.* at *3 ("The

8

CEO of AsiaSat described [GMW's] obligation to provide a guarantee or backstop for the Proposed EXIM Loan as 'the basis for the agreement' and a 'key element' of the Cooperation Agreement," and GMW "understood that obtaining a guarantee or backstop for the . . . Loan was 'critical' to AsiaSat."). But the Convertible Note—which was intended to provide AsiaSat with a way to obtain equity in GMW—proved controversial. Specifically, GMW's attorneys objected to GMW issuing the Convertible Note because it would make the STORM sensor the collateral for the EXIM loan, which NOAA would not accept. As a consequence, GMW refused to issue the Convertible Note, viewing it as too onerous, despite such issuance being included as an express condition in the Cooperation Agreement and AsiaSat's insistence that it receive the Convertible Note before further pursuing the loan from the EXIM Bank.

While it was working with AsiaSat, GMW terminated the PSPA with USURF and, in turn, entered into a Preferred Provider Agreement ("PPA") with AWSF—USURF's subsidiary— in April 2013. Among other things, the PPA obligated GMW to maintain and fulfill a soon-to-be entered contract with AWSF called the STORM 001 Contract, to be executed in October 2013. Included within the scope of maintenance and fulfillment under the contracts was compliance by GMW with the STORM 001 Contract's payment schedule. Failure to comply with this schedule was considered a "default" under the PPA. In the event of default, AWSF was authorized to terminate the PPA by giving written

9

notice and a thirty-day cure period to GMW.  If, after thirty days, GMW had not cured the default, the PPA would be terminated.

As contemplated in the PPA, GMW and AWSF executed the STORM 001 Contract on October 4, 2013.  The payment schedule in this agreement required GMW to make an initial payment of $5,384,022 to AWSF on January 6, 2014, toward a total payment of $124,933,872; the balance remaining after the $5,384,022 payment would come later.  GMW knew that AWSF would be unable to build the STORM sensor unless it received the payment.  Like the PPA, the STORM 001 Contract considered GMW's failure to make a payment when due a "default," and AWSF was empowered to discontinue its performance and terminate the agreement in the event of default.

GMW and AWSF also executed on the same day the STORM 002 Contract for "Field Support" of the sensor system.  Per the STORM 002 Contract, GMW was required to initially pay AWSF $27,131 by February 4, 2014, toward a total payment of $26,509,120, which was scheduled to be paid in full later.  In sum, under these two STORM Contracts (collectively, the "Build Agreements"), GMW was required to ensure adequate funding to comply with the payment schedules contemplated.  And GMW's failure to make any milestone payments would amount to an "Event of Default," entitling AWSF to immediately cease performance and terminate the Build Agreements.

For its part, AsiaSat commenced the EXIM Bank's loan process in early 2013. But by July 2013, "it became apparent that [GMW] would not be able to provide a guarantee or backstop for the Proposed EXIM Loan before the July 31, 2013, Cut-off Time." *Id.* at *4. In light of this, AsiaSat informed GMW that it was not going to submit the Proposed EXIM Loan to the EXIM Bank for approval. Hoping they could continue working towards a mutual goal, however, AsiaSat and GMW extended the Cut-off Time to September 30, 2013. AsiaSat informed GMW that the "only outstanding thing" was the guarantee, and that it would resume the EXIM loan process once it got more clarity on this issue. *Id.*; *see id.* (excerpting an email from AsiaSat's CEO to GMW in which the CEO stated that AsiaSat suspended the EXIM loan process "until [it] ha[d] the guarantee sorted out" and that the "key driver [was] still the guarantee").

By August 2013, though, GMW still had not provided the required guarantee or the Convertible Note, leading AsiaSat to halt the EXIM loan process entirely. And while GMW discussed alternatives to the Article 2.2.1 conditions, AsiaSat never agreed to any.

In September 2013, still awaiting GMW's fulfillment of the conditions precedent, AsiaSat agreed to extend the Cut-off Time once again, pushing the cut-off to November 30, 2013. A week before this extended cut-off, on November 24, 2013, GMW reached out to AsiaSat and asked if there was an alternative way to structure their deal—that is, alternatives to the Article 2.2.1

11

conditions—and if AsiaSat could support AWSF for a few months.  AsiaSat, again, reiterated it needed the guarantee, as provided in the Cooperation Agreement, before it would resume the loan process.  November 30, 2013, came and went without GMW's performance of the Article 2.2.1 conditions, and AsiaSat, accordingly, declined to proceed further.

While AsiaSat was waiting for GMW to fulfill its contractual obligations, GMW's attorney introduced GMW's then-CEO to Mr. Hall on September 20, 2013.  AWSF and USURF had encouraged GMW to meet with Mr. Hall, believing he could provide the critical backstop required by the Cooperation Agreement. GMW shared confidential business and technical information with Mr. Hall and his team, having received assurances from AWSF and USURF that Mr. Hall would maintain confidentiality.

On November 3, 2013, however, Mr. Hall emailed AsiaSat's CEO and explained that GMW was "in trouble" and was contractually obligated to pay AWSF $6 million in January 2014, with another $8 million required in February 2014.  Aplt.'s App., Vol. 18, at 4489 (Email from Alan Hall to William Wade, AsiaSat, dated Nov. 3, 2013).  Mr. Hall further explained that, if GMW failed to pay AWSF, he was prepared to obtain an NOAA license like the one GMW held. He then proposed that AsiaSat go into business with him; specifically, they would each own forty-two percent in a new venture, with Utah State University owning one percent, and the employees of the business venture owning fifteen percent.

12

Mr. Hall noted that Utah State University and AWSF were excited about the plan, but he requested AsiaSat to not speak about it with GMW.[4]

Mr. Hall, on behalf of Island Park Properties, entered into a Mutual Non-Disclosure Agreement ("Mutual NDA") with GMW on November 6, 2013. The Mutual NDA limited how Island Park could use GMW's confidential information, with Island Park agreeing that it would not disclose, discuss, or use the information for any purpose other than to facilitate the development and distribution of GMW's systems and services. Despite the Mutual NDA, the Hall Defendants launched a business entity called Tempus Global Data, Inc., on December 20, 2013.[5] A few months later, on April 1, 2014, Tempus announced it

---

[4]    Mr. Hall specifically stated in his email that "GMW is in trouble," with its leaders "hav[ing] spent nearly 6 million dollars with no revenue commitments." Aplt.'s App., Vol. 18, at 4489. Mr. Hall adds that "AWS is facing a severe financial crisis" and "USU is in turmoil as it sees the opportunity failing." *Id.* Mr. Hall then proposed a "solution" in the form of him "cover[ing] the AWS payroll for the next 2 months." *Id.* He then claimed, "I'm ready if GMW defaults to obtain the storm license. I'm ready to build a new firm that oversees construction of six storm sensors (in the next 36 months); aggressively land scores of clients; raise funds to cash flow the business until profitable and ultimately create a multi-billion dollar enterprise." *Id.* Mr. Hall then asked for AsiaSat's "help as a business partner and as a potential owner in the new business," inviting AsiaSat to invest in the company and lend support. *Id.* He ended his email by stating that "USU and AWS love this plan and will happily discuss it with you." *Id.* Mr. Hall also wrote that he "ha[d] not broached this matter with GMW and ask you to not speak with me in the near term." *Id.*

[5]    Tempus, along with Mr. Hall, AWSF, and others, filed an intellectual property suit against GMW on April 25, 2014. Tempus eventually ceased all operations in June 2016, having never paid any salaries, dividends, or

(continued...)

13

had commenced operations in Utah "to deliver a hyperspectral weather sensor and . . . was in the final stages of securing a[n] NOAA license." *GeoMetWatch*, 2018 WL 6240991, at *7.

On January 6, 2014, GMW failed to pay AWSF the roughly $5.4 million it was required to remit under the terms of the STORM 001 Contract. The next day, AWSF notified GMW that its failure to remit the required payment constituted a default of the STORM 001 Contract and a material breach of the PPA. As a consequence, AWSF was discontinuing performance of and terminating the STORM 001 Contract and the PPA if GMW did not cure the default within thirty days. GMW failed to cure during this period; consequently, AWSF terminated the agreements.

At around the same time, GMW resumed talks with AsiaSat—that is, just months after AsiaSat had stopped the EXIM Bank loan process at the end of 2013 when GMW failed to fulfill either its backstop or Convertible Note obligations under the Cooperation Agreement. AsiaSat notified GMW that the Cooperation Agreement's terms still applied to any potential deal, and the parties reached no agreement as to another extension of the Cooperation Agreement's Cut-off Time.

Following AWSF's termination of the agreements it had with GMW, GMW

[5](...continued)
compensation of any kind. It never generated revenue, has pursued no business opportunities since it ceased operations, and has no employees or operating capital.

sought out another entity that could construct the STORM sensor. In February 2014, it approached AsiaSat with a new proposal, where another business entity (i.e., the "American Manufacturer")[6] would take AWSF's role and construct the STORM sensor. Indeed, GMW had prior discussions about such an arrangement with the American Manufacturer in 2012.

AsiaSat, however, wanted something "concrete" from the American Manufacturer before it considered re-engaging with GMW. The American Manufacturer also was concerned that GMW lacked sufficient funds to move forward with the STORM project, and it believed GMW was running out of money and was hoping to use the American Manufacturer to obtain funds from AsiaSat to stave off collapse. The American Manufacturer never agreed to provide the Cooperation Agreement's guarantee for any potential EXIM loan. Nonetheless, GMW and the American Manufacturer entered into a Time and Materials Purchase Agreement in February 2014, under which the entity would "figure out integration" of its sensor model with GMW's needs, in exchange for

_____

[6]     The district court initially provided the identity of the American Manufacturer in an order disposing the Hall Defendants' motion for summary judgment. The court, however, amended the order a week later "to remove references to specific entities not party to this litigation." *GeoMetWatch*, 2018 WL 6240991, at *1 n.1; *see supra* note 9 (addressing the amended order). The district court in that amended order deleted any reference to the American Manufacturer's identity, opting instead to refer to it as the "American Manufacturer." *Id.* at *6. We follow the district court's naming convention in this opinion, and similarly refer to that entity as the American Manufacturer.

15

$500,000 from GMW. *Id.* at *6. But this was not an agreement to build the STORM sensor or any other type of sensor.

Nevertheless, in March 2014, GMW and the American Manufacturer met with AsiaSat and presented the idea that the American Manufacturer would construct the STORM sensor. AsiaSat was unimpressed, still troubled by the lack of a guarantee. Consequently, AsiaSat made no commitment to GMW, declined to resume the EXIM loan process, and, on April 16, 2014, formally terminated the Cooperation Agreement with GMW.

GMW ran out of money in May 2014, and it failed to make payments to the American Manufacturer required under the Time and Materials Purchase Agreement. The American Manufacturer ordered its employees to cease work a month later. It engaged with GMW in subsequent discussions in 2015, but nothing came from them.

**B**

On May 16, 2014, GMW filed its initial complaint against Defendants. GMW amended its complaint three times, with the Third Amended Complaint serving as the action's operative complaint. In it, GMW brought twelve claims against Defendants based on the events surrounding GMW's failed venture and its supposed lost profits because of the venture's failure.[7] GMW does not so much

---

[7] Those claims are: Breach of Contract against Mr. Hall, Island Park,

(continued...)

contest the occurrence of the described events, as the prism through which they should be viewed.  In GMW's telling, all its failures to move forward with AsiaSat—and, consequently, the potential profits it lost—are attributable to the bad acts of the Hall Defendants, with the remaining Defendants conspiring with them to ensure GMW's downfall.

Under Utah law, "[l]ost profits must be established with reasonable certainty."  *Cook Assocs., Inc. v. Warnick*, 664 P.2d 1161, 1165 (Utah 1983).  This requires "proof of 'sufficient certainty that reasonable minds might believe from a preponderance of the evidence that the damages were actually suffered.'"  *Id.* (quoting *First Sec. Bank of Utah v. J.B.J. Feedyards*, *Inc.*, 653 P.2d 591, 596 (Utah 1982)).  "This requirement applies to proof of (1) the fact of lost profits, (2) *causation* of lost profits, and (3) the amount of lost profits."  *Id.* (emphasis

---

[7](...continued)
USURF and AWSF; Misappropriation under the Utah Trade Secrets Act, Utah Code § 13-24-1, against all Defendants; Breach of Implied Covenant of Good Faith and Fair Dealing against Mr. Hall, Island Park, the USURF Defendants, and AWSF; Intentional Interference with Existing or Potential Economic Relations against all Defendants; Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)-(b), against the Hall Defendants, USURF, and AWSF; Unjust Enrichment against the Hall Defendants, USURF, and AWSF; Violation of the Utah Truth in Advertising Act, Utah Code Ann. § 13-11a-1, *et seq.*, against the Hall Defendants, USURF, and AWSF; Violation of the Utah Unfair Practices Act, Utah Code Ann. § 13-5-1 *et seq.*, against the Hall Defendants, USURF, and AWSF; Fraudulent Inducement against Mr. Hall, AWSF, Mr. Behunin, and USURF; Breach of Fiduciary Duty against Mr. Behunin and USURF; Fraudulent Nondisclosure against all Defendants except for Island Park; and Civil Conspiracy against all Defendants.

17

added).  To establish that Defendants' actions were the cause of its lost profits, GMW presented "four damages scenarios" and relied on expert testimony to establish its two causation theories: that is, first, Defendants' bad acts caused it to lose profits; and, second, Defendants were unjustly enriched by stealing GMW's trade secrets.  Aplt.'s Opening Br. at 43; *see* Aplt.'s App., Vol. 9, at 1762–63, 1884 (GMW's Resp. to Hall Defs.' Summ. J. Mot., filed Jan. 22, 2018).

Specifically, GMW articulated its first three damages scenarios under a lost profits damages theory—the idea being that GMW "had the ability to complete the project [under] each of [its] three [proffered scenarios], but for the Hall Defendants' interference."  Aplt.'s App., Vol. 9, at 1763.  In GMW's own words:

> [T]here were three scenarios in which [GMW] could have succeed[ed], but for the Hall Defendants' wrongful conduct . . . .
>
> Scenario 1: The Instrument[8] is built by [AWSF], AsiaSat . . ., provides an equity investment and project support as reflected in the Cooperation Agreement, and the [EXIM Bank] provides financing based upon AsiaSat's pledge of its balance sheet, which AsiaSat conditioned upon an acceptable backstop to mitigate the financial risk associated with the Instrument.
>
> Scenario 2: The Instrument is built by [the American Manufacturer], AsiaSat provides an equity investment and project support as reflected in the Cooperation Agreement, and EXIM provides financing based upon AsiaSat's pledge of its balance sheet, which AsiaSat conditioned upon an acceptable backstop to mitigate the financial risk associated with the Instrument.

---

8    The "Instrument" refers to the STORM sensor.  *See* Aplt.'s Opening Br. at 18.

Scenario 3: The Instrument is built by [the American Manufacturer], AsiaSat's payload hosting services are replaced by a different commercial satellite operator . . ., and new equity and debt are obtained from the marketplace, including possibly through EXIM project financing . . . or through another export credit agency [ ].

*Id.* at 1762 (footnote added).  GMW also proffered another damages scenario based on an unjust enrichment theory—an idea that centers on "the Hall Defendants [allegedly] purloin[ing] [GMW's] confidential and proprietary documents and information—its crown jewels—which were central to both [GMW's] and Tempus's value."  *Id.* at 1884.

To provide meat to these theories, GMW specifically points to the November 3, 2013, email from Mr. Hall to AsiaSat as evidence of an alleged conspiracy between Mr. Hall, AWSF, and USURF.  GMW also points to later communications from Mr. Hall as evidence of a causal nexus between Defendants' bad acts and GMW's alleged damages.  Particularly, GMW highlights a February 2014 email in which Mr. Hall stated that he "was actively working to 'put the last nail in [GMW's] coffin,' because he decided he '[couldn't] leave them thinking they [were] still in the game.'"  Aplt.'s Opening Br. at 39 (quoting Aplt.'s App., Vol. 21, at 5314 (Email from Alan Hall to Robert Behunin, Utah State Univ., dated Feb. 7, 2014)).  GMW also cites a March 2014 email chain where Mr. Hall demanded that AsiaSat stop negotiating with GMW.

19

*See* Aplt.'s App, Vol. 20, at 5083–84 (Emails between Alan Hall and William Wade, AsiaSat, dated Mar. 14, 2014).

In another email chain, William Wade of AsiaSat blind copied Mr. Hall on an email to GMW stating that AsiaSat would not be moving forward with GMW on the STORM project because of the "lack of financial guarantees, a credible commercialization plan[,] or a deployment schedule compatible with AsiaSat 9." *Id.* at 5087 (Emails between Alan Hall and William Wade, AsiaSat, dated Mar. 19, 2014). Mr. Hall forwarded the message to others, including certain Defendants—i.e., Erin Housley, Mark Hurst, Scott Jensen, and Curtis Roberts—simply commenting, "Sweet!!" *Id.*

In sum, based in part on communications such as these, GMW posits that the failure of its venture was caused by the Hall Defendants' theft of GMW's trade secrets and other illicit conduct, in concert with the other Defendants. While GMW does not contest the fact that it failed to fulfill the obligations and conditions it owed to AsiaSat and AWSF under the respective contracts it entered into with them, GMW effectively argues that any lost profits it suffered were not self-inflicted, but rather were the result of Defendants' conduct.

AWSF, for its part, filed a counterclaim against GMW, providing the following allegations: (1) AWSF and GMW executed the Build Agreements to construct the STORM sensor; (2) the Build Agreements obligated GMW to make certain payments by certain dates, as governed by a larger payment schedule;

20

(3) GMW failed to make such payments—specifically, GMW "breached th[e] [Build] [A]greements when it failed to make its contractually-required $5.38 million payment in January 2014"; and, as a result, (4) AWSF suffered millions of dollars in damages. Aplt.'s App., Vol. 75, at 16438–42 (AWSF's Cross-Mot. for Summ. J., filed May 20, 2019); *see also id.*, Vol. 76, at 16526–43 (GMW's Renewed Mot. for Summ. J. Regarding AWSF's Countercl., filed May 20, 2019). AWSF requested an award amounting to $1,979,796.11 in actual, compensatory damages. Responding to the counterclaim, "GMW d[id] not dispute that it failed to make its contractually required . . . payment on January 6, 2014," but rather, it "provide[d] two affirmative defenses in an attempt to justify [its] breach: 1) fraudulent inducement and 2) prior breach." *Id.*, Vol. 75, at 16443.

## C

All Defendants filed separate motions for summary judgment before the district court. The district court ultimately granted summary judgment to all Defendants. The following is a summary of the court's dispositions as to the summary judgment motions of each Defendant group: (1) the Hall Defendants, (2) the USURF Defendants and AWSF Defendants, (3) and AWSF, which motioned for summary judgment on its counterclaim.

**1**

Regarding the Hall Defendants, on November 21, 2018, the court granted in part their motion for summary judgment as to GMW's causation theories.[9] Specifically, the district court dismissed GMW's lost profits damages and unjust enrichment theories because GMW could not recover damages under either of these theories.

The district court found that "the evidence in this case is simply insufficient to support a conclusion that the defendants caused [GMW] any damage." *GeoMetWatch*, 2018 WL 6240991, at *8. With respect to GMW's experts, the district court explained that, critically, all but one of them "d[id] not opine," or even purport to opine, that the Hall Defendants' conduct "was the cause of the lost profits [GMW] sought." *Id*. at *9.

The court discussed this omission by explaining in a detailed footnote that GMW's experts—Mark Piegza, Rick Hoffman, Jozsef Szamosfalvi, and Matthew O'Connell—did not testify as to the causal connection between Defendants' conduct and AsiaSat's decision to terminate the Cooperation Agreement. *See id*. at *9 n.11. The district court further noted that the "closest any of [GMW's] experts comes to linking the conduct" of Defendants to AsiaSat's decision was

---

[9]    A few days later, on November 27, an amended order was issued "to remove references to specific entities not party to this litigation." *GeoMetWatch*, 2018 WL 6240991, at *1 n.1.

Mr. O'Connell's assertion that the public announcement of Tempus's creation destroyed any "first-mover" advantage on GMW's part, thereby frustrating any funding opportunities for GMW. *Id.* But the district court found that Mr. O'Connell's opinion was facially speculative and was not supported by any facts.

Specifically, the district court stated that Mr. O'Connell did not opine whether GMW could have actually obtained funding absent the loss of a "first-mover" advantage, provided no reason why the market for GMW's services could only consist of one single entity, and proffered no factual allegations or argument as to why it was the loss of GMW's apparent "first-mover" advantage that caused GMW's own failure to secure funding in 2014 "to the exclusion of other equally plausible explanations." *Id.* Thus, to the extent Mr. O'Connell's testimony was proffered in support of causation, the court excluded it under Rule 702 of the Federal Rules of Evidence.[10]

The district court explained that, "even assuming that a *Daubert*[11] hearing on [GMW's] experts resulted in a ruling that their opinions were admissible, those opinions are insufficient to establish a causal nexus between defendants' conduct and [GMW's] claim for lost profits." *Id.* at *8. Accordingly, the court granted

---

[10]    With respect to Mr. O'Connell's testimony, he testified he had no opinion on whether the Hall Defendants caused the events leading to GMW's failure. *See* Aplt.'s App., Vol. 22, at 5369–70 (Matthew O'Connell Dep. Tr., dated Mar. 9, 2018).

[11]    *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

23

partial summary judgment because of insufficient evidence as to causation.  *See*

*id.* at *8–9.  This conclusion is best described by the court:

> [I]ndependent of anything the Hall Defendants did, [GMW] was unable to perform under the Cooperation Agreement.  [GMW] was not able to obtain a sufficient backstop, and [GMW] was unable to provide AsiaSat with a convertible note.  As a result, AsiaSat refused to undertake the loan process and [GMW] was unable to obtain the funds it needed.  Consequently, [GMW] was unable to pay AWSF to build the STORM sensor.

*Id.* at *13.

The district court's decision left alive GMW's "nominal and statutory

damages" claims against the Hall Defendants, specifically Tempus.  *Id.* at *16;

*see id.* at *8 n.9 ("On the remaining three claims (violation of Section 43(a) of the

Lanham Act against Tempus, violation of Utah's Truth in Advertising Act against

Tempus, and violation of Utah's Unfair Practices Act against Tempus), the

moving defendants seek summary judgment on grounds that [GMW] failed to

provide, in its initial disclosures, computations of the nominal and statutory

damages it seeks.").  On August 2, 2019, the court granted summary judgment to

Tempus on GMW's claims—specifically, the Utah Truth in Advertising Act, Utah

Unfair Practices Act, and the Lanham Act.  The district court noted that GMW did

not oppose summary judgment on its remaining Utah statutory claims and did not

provide evidence to establish the necessary elements of a federal Lanham Act

claim.  Thus, those remaining claims against Tempus were dismissed.

24

**2**

As for the AWSF and USURF Defendants, on February 4, 2019, the court partially granted summary judgment specifically to AWSF, USURF, and Mr. Roberts (USU's Senior Associate Vice President for Commercialization and University Advancement) under the UGIA. After certifying certain questions to the Utah Supreme Court, which then provided guidance, *see GeoMetWatch Corp. v. Utah State Univ. Research Found.*, 428 P.3d 1064 (Utah 2018), the court concluded that USURF and AWSF are governmental entities immune from GMW's suit and Mr. Roberts was entitled to summary judgment because the claims against him "ar[o]se from actions taken within the scope of his employment with a governmental entity." *GeoMetWatch Corp. v. Hall*, No. 1:14-cv-00060-JNP-PMW, 2019 WL 430886, at *6 (D. Utah Feb. 4, 2019). The court thus dismissed GMW's claims against Mr. Roberts and its "state-law, non-contract claims" against USURF and AWSF. *Id.* at *7. At that point, GMW's federal Lanham Act claim remained against USURF and AWSF.

Regarding the other AWSF and USURF Defendants, the district court did not grant summary judgment to Mr. Jensen (the aerospace engineer from Utah State University and former director of AWSF) and Mr. Behunin (Utah State University's Vice President for Advancement and Commercialization) because there was no "record evidence reg[ar]ding the scope" of the two employees' employment, or evidence indicating "whether actions taken outside the scope of

25

their employment gave rise to [GMW's] claims." *Id.* The court explained that both men had the initial burden of showing the appropriateness of summary judgment on the scope of employment issue, and they failed to satisfy that burden. *Id.*

Thereafter, on February 12, 2019, the district court granted AWSF and USURF's summary judgment motions filed separately as to GMW's remaining federal Lanham Act claims against them. As to AWSF, the court dismissed that claim because the statements GMW cited that purportedly established AWSF's liability were actually made by Tempus, *not* AWSF. Moreover, the district court noted that there was no authority for GMW's "novel proposition" that would attach liability to AWSF for "assist[ing] another in making false or misleading statements of fact." *GeoMetWatch Corp. v. Hall*, No. 1:14-cv-60, 2019 WL 578917, at *2 (D. Utah Feb. 12, 2019). For largely the same reasons, the court also dismissed GMW's Lanham Act claim against USURF. *GeoMetWatch Corp. v. Hall*, No. 1:14-cv-60, 2019 WL 575951, at *2–3 (D. Utah Feb. 12, 2019).

On August 2, 2019, the court granted summary judgment to Mr. Jensen and Mr. Behunin on all claims asserted against them. The court reasoned that because "the damages causation defects identified by the [November 21, 2018, Order] are not defendant-specific . . . Messrs. Jensen and Behunin are entitled to complete summary judgment for all the reasons articulated in th[at] [order]." *GeoMetWatch Corp. v. Hall*, No. 1:14-cv-60, 2019 WL 3532047, at *1 (D. Utah Aug. 2, 2019).

26

**3**

As for AWSF's counterclaim, on August 6, 2019, the district court filed a sealed memorandum granting in part and denying in part AWSF and GMW's cross-motions for summary judgment on the counterclaim.[12]  The court explained, specifically, that AWSF was entitled to summary judgment despite GMW's affirmative defense arguments of fraudulent inducement and prior breach, while GMW was entitled to summary judgment on its argument that AWSF may not recover its expenditures incurred before the date the parties executed the STORM 001 Contract.  Thus, AWSF was only entitled to an amount of $39,030.44.

***

On the same day, the court issued its final judgment.  That final judgment summarized the court's relevant rulings in this appeal: Judgment is entered (1) in favor of Defendants "on all claims asserted" in GMW's Third Amended Complaint and (2) in favor of AWSF's counterclaim against GMW in the amount of $39,030.44.[13]  Aplt.'s App., Vol. 90, at 19706 (Final Judgment, dated Aug. 6, 2019).  This appeal followed shortly thereafter, with GMW timely filing its Notice of Appeal on September 3, 2019.

---

[12]    The court published a public version of the memorandum containing the same holding on August 20, 2019.

[13]    The court also entered judgment in favor of third-party defendant Mr. Crain against USURF.  This decision is not on appeal before us.

27

## II

"[W]e review a district court's grant of summary judgment de novo, applying the same standard as the district court." *Morris v. City of Colorado Springs*, 666 F.3d 654, 660 (10th Cir. 2012) (quoting *Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011)). "Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Dullmaier v. Xanterra Parks & Resorts*, 883 F.3d 1278, 1283 (10th Cir. 2018) (quoting FED. R. CIV. P. 56(a)).

Movants "shoulder the 'initial burden [of] show[ing] that there is an absence of evidence to support the nonmoving party's case.'" *Clinger v. N.M. Highlands Univ., Bd. of Regents*, 215 F.3d 1162, 1165 (10th Cir. 2000) (quoting *Thomas v. IBM*, 48 F.3d 478, 484 (10th Cir. 1995)). Should they meet this burden, it then "falls to [the nonmovant] to 'identify specific facts that show the existence of a genuine issue of material fact.'" *Id.* (quoting *Thomas*, 48 F.3d at 484). To survive summary judgment, the nonmovant "must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." *Id.* (quoting *Thomas*, 48 F.3d at 484).

"No genuine issue of material fact exists 'unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party.'" *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019) (quoting *Bones v. Honeywell Int'l, Inc.*, 366

28

F.3d 869, 875 (10th Cir. 2004)); *see also SEC v. Thompson*, 732 F.3d 1151, 1157 (10th Cir. 2013) ("Even though we view the evidence in the nonmovant's favor, . . . a factual dispute cannot be said to be 'genuine' if the nonmovant can do no more than 'simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006))).

"For there to be a 'genuine' dispute of fact, 'there must be more than a mere scintilla of evidence,'" and summary judgment is properly granted "if the evidence is merely colorable or is not significantly probative." *Rocky Mountain Prestress, LLC v. Liberty Mut. Fire Ins. Co.*, 960 F.3d 1255, 1259 (10th Cir. 2020) (quoting *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993)). And while we draw all reasonable inferences in favor of the non-moving party, "an inference is unreasonable if it requires 'a degree of *speculation* and conjecture that renders [the factfinder's] findings *a guess or mere possibility*.'" *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1334 (10th Cir. 2017) (alteration in original) (emphases added) (quoting *United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008)).

In this vein, "'statements of mere belief' . . . must be disregarded" at the summary judgment stage. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (quoting *Tavery v. United States*, 32 F.3d 1423, 1427 n.4 (10th Cir. 1994)). "Unsubstantiated allegations carry no probative

weight in summary judgment proceedings." *Hasan*, 935 F.3d at 1098 (quoting *Bones*, 366 F.3d at 875). Nor can the nonmovant "defeat summary judgment by relying on 'ignorance of the facts, on speculation, or on suspicion.'" *Genzer v. James River Ins. Co.*, 934 F.3d 1156, 1160 (10th Cir. 2019) (quoting *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988)). "Rather, '[t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.'" *Hasan*, 935 F.3d at 1098 (alteration in original) (quoting *Bones*, 366 F.3d at 875).

Because the district court exercised both diversity and supplemental jurisdiction over GMW's state-law claims relevant to this appeal, we apply the substantive law of Utah, the forum state, in our review. *See BancOklahoma Mortg. Corp. v. Cap. Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999) (noting that "[a] federal court sitting in diversity applies the substantive law . . . of the forum state," and "[t]his rule also applies when a federal court exercises supplemental jurisdiction over state law claims in a federal question lawsuit" (quoting *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir. 1994))).

## III

GMW raises three issues in this appeal: (**A**) whether the district court erred in granting summary judgment to Defendants based on GMW's alleged lack of non-speculative causation evidence; (**B**) whether the court erred in granting summary judgment to USURF, AWSF, and Mr. Roberts based on governmental

30

immunity under the UGIA; and **(C)** whether the court erred in granting partial

summary judgment to AWSF on its counterclaim for breach of contract and

rejecting GMW's cross-motion and affirmative defenses.  We turn to each of

these three issues below.

## A

GMW contends that the court erred in granting summary judgment to

Defendants because it purportedly lacked evidence to establish causation.

However, virtually all of GMW's contentions on this issue miss the mark because

GMW still fails to provide legal or evidentiary support linking Defendants'

purported bad acts to GMW's alleged lost profits.  Proving causation is the key in

our review, and GMW's arguments are largely meritless or irrelevant on this

issue.

Following the order of GMW's arguments from its Opening Brief, we start

by analyzing its contentions challenging the legal standards that the district court

applied.  We then shift to GMW's arguments against the court's rejection of

Scenario 3 of GMW's multi-scenario lost profits damages theory.  Afterwards, we

examine GMW's challenges to the court's disposition of Scenarios 1 and 2.  For

the reasons discussed below, we conclude that all of GMW's contentions are

either waived or otherwise unavailing.

## 1

GMW first takes issue with the court's explanation of the legal standards as

to damage causation.  The court explained the purportedly relevant law as

follows:

> Whether a defendant caused lost profits "is generally determined by an examination of the facts, and questions of fact are to be decided by the jury." *Mahmood v. Ross*, 990 P.2d 933, 938 (Utah 1999).  "However, this does not mean that a jury is free to find a causal connection between a breach and some subsequent injury by relying on unsupported speculation." *Id.* And "[w]hen an injury may have come from either one of two causes, either of which may have been the sole proximate cause, it devolves on the plaintiff to prove by a preponderance of the evidence that the cause for which the defendant was liable was culpable and the proximate cause." *Tremelling v. S. Pac. Co.*, 170 P. 80, 84 (Utah 1917) (quoting *Edd v. Union Pac. Coal Co.*, 71 P. 215 (Utah 1903)).

> Put another way, while a jury may make "deductions based on reasonable probabilities, 'the evidence must do more than merely raise a conjecture or show a probability [as to proximate cause].'" *Mahmood*, 990 P.2d at 939 (quoting *Sumsion v. Streator-Smith, Inc.*, 132 P.2d 680, 683 (Utah 1943)).  "Where there are probabilities the other way equally or more potent[,] the deductions are mere guesses and the jury should not be permitted to speculate." *Id.* (citation omitted).  Thus, "where 'the proximate cause of the injury is left to conjecture, the plaintiff must fail as a matter of law.'" *Id.* (citation omitted).  And though Utah law tolerates some uncertainty in fixing the amount of lost profits in favor of a start-up venture, this relaxed standard is triggered only once causation has been established.  *See Kilpatrick v. Wiley, Rein & Fielding* (*Kilpatrick II*), 37 P.3d 1130, 1146 (Utah 2001).

*GeoMetWatch*, 2018 WL 6240991, at *11 (alterations in original).

GMW objects to the district court's heavy reliance on *Mahmood*.  Aplt.'s

Opening Br. at 45 n.16.  Specifically, GMW complains about the district court's

use of *Mahmood*—a case which purportedly "suggest[s] that, if the evidence is

32

*evenly balanced*, or weighs against a finding of causation, the court should take the matter away from the jury." *Id.* GMW contends that the court's decision "to apply *Mahmood* and weigh the evidence is contrary to state and federal rules of civil procedure, and case law on causation." *Id.*; *cf. id.* (noting that *Mahmood*'s purportedly objectionable language is drawn from a 1943 case, which in turn drew from a 1917 case, yet "[t]hese cases were decided before the modern rules of civil procedure and modern cases . . . confirm[ed] causation is fact intensive").

Instead of *Mahmood*, which it views as too defendant-friendly, GMW offers the Utah Court of Appeals' decision *Kilpatrick v. Wiley, Rein & Fielding* (*Kilpatrick I*)—a predecessor of the Utah Supreme Court's *Kilpatrick II* decision; it apparently emphasizes that "[c]ausation is a highly fact-sensitive element of any cause of action" that "[g]enerally . . . cannot be resolved as a matter of law." *Id.* at 45 (quoting *Kilpatrick v. Wiley, Rein & Fielding* (*Kilpatrick I*), 909 P.2d 1283, 1292 (Utah Ct. App. 1996)). Under that case, "*only if there is no evidence* upon which a reasonable jury could *infer* causation, is summary judgment appropriate." *Id.* (quoting *Kilpatrick I*, 909 P.2d at 1292). And it "only takes one sworn statement under oath to dispute the averments on the other side of the controversy and create an issue of fact." *Id.* at 46 (quoting *Kilpatrick I*, 909 P.2d at 1292); *see also id.* (noting that "circumstantial evidence can . . . defeat summary judgment in appropriate circumstances," and "a plaintiff is not required to prove [its] case by direct proof alone" (omission in original) (quoting

33

*Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 651 (10th Cir. 2008))).  Thus, GMW

surmises that "Utah litigants do not easily dispose of the element of causation on

summary judgment."  *Id.* at 46 (underlining omitted) (quoting *Kilpatrick I*, 909

P.2d at 1292).  In GMW's eyes, "causation arguments are for the jury, and

[cannot] be decided as a matter of law."  *Id.* at 49.

This argument is unpersuasive.  To start, it seems that GMW, through the

arguments it presents on this issue, effectively urges us to follow Utah summary

judgment standards over federal summary judgment standards.  Insofar as GMW

actually does this, we note that federal courts follow federal procedural law,

which includes our well-established summary judgment standards.  *See, e.g.*,

*Prager v. Campbell Cnty. Mem'l Hosp.*, 731 F.3d 1046, 1060 (10th Cir. 2013)

("In diversity cases, the substantive law of the forum state governs the analysis of

the underlying claims, including specification of the applicable standards of

proof, but federal law controls the ultimate, procedural question whether

judgment as a matter of law is appropriate." (quoting *Haberman v. Hartford Ins.

Grp.*, 443 F.3d 1257, 1264 (10th Cir. 2006))); *Foster v. Alliedsignal, Inc.*, 293

F.3d 1187, 1194–95 (10th Cir. 2002) ("[A] federal court sitting in diversity will

be guided by federal-law standards governing summary judgment procedure.").

Accordingly, the district court in this case was tasked to apply federal

summary judgment standards in its analysis which, as we have explained above,

require GMW to present "evidence, including testimony, [that] must be based on

34

more than *mere speculation, conjecture, or surmise*" in order to defeat summary

judgment. *Hasan*, 935 F.3d at 1098 (emphasis added) (quoting *Bones*, 366 F.3d

at 875). Thus, as a preliminary matter, GMW's argument that the court erred by

applying defendant-friendly legal standards as to causation in the summary

judgment context is undermined because federal summary judgment standards

apply, and GMW—specifically on this issue—largely failed to frame its

disagreement with the district court's causation conclusions under federal

summary judgment standards.

In any event, GMW fails to demonstrate any ambiguity or conflict in Utah's

caselaw as to causation and summary judgment, particularly between *Mahmood*

and *Kilpatrick I*. Of course, the Utah Supreme Court's decision in *Mahmood*

would control to the extent it contradicted the earlier intermediate court's

decision in *Kilpatrick I*. But contrary to GMW's suggestions that *Mahmood* is too

favorable towards movants, *Mahmood* itself explains, "[u]nder Utah law, a party

who moves for a directed verdict has the very difficult burden of showing that *no*

evidence exists that raises a question of material fact." 990 P.2d at 937 (quoting

*Alta Health Strategies, Inc. v. CCI Mech. Serv.*, 930 P.2d 280, 284 (Utah Ct. App.

1996)). It instructs that "[i]f there is *any* evidence raising a question of material

fact, judgment as a matter of law is improper." *Id.* (emphasis added). It is thus a

stretch for GMW to argue that *Mahmood* wrongly alleviates the burden movants

shoulder to be awarded summary judgment.

Specifically, we see no conflict with the principles laid out in *Mahmood* when compared to GMW's preferred caselaw. In particular, *Kilpatrick I*—GMW's own referenced case—similarly states, "only if there is *no evidence* upon which a reasonable jury could infer causation, is summary judgment appropriate." *Kilpatrick I*, 909 P.2d at 1292 (emphasis added) (quoting *Harline v. Barker*, 854 P.2d 595, 600 (Utah Ct. App. 1993)). Indeed, *Kilpatrick I*, as clarified by the Utah Supreme Court's subsequent decision in that case, provides no additional assistance to GMW's cause when we review what it says about causation as applied to new or start-up ventures like GMW. While the Utah Supreme Court states that new or "start-up" businesses are to be provided some leeway in how they prove that they lost *a certain amount* of profit due to a defendant's actions—despite their "lack [of] an actual record of past earnings"—that flexibility was *not* extended to how such businesses prove causation. *Kilpatrick II*, 37 P.3d at 1146 (emphasis added).

Turning to the facts of this case, as both *Mahmood* and *Kilpatrick I* instruct courts to review, GMW proffered "no evidence" to establish its causation theories. *Kilpatrick I*, 909 P.2d at 1292. The district court did not weigh the evidence, nor did it disregard any sworn statements that could have created issues of fact; the court simply concluded that "there remains *a lack of evidence* suggesting that the *cause* of the venture's failure was the conduct of the defendants." *GeoMetWatch*, 2018 WL 6240991, at *9 (first emphasis added).

36

Focusing on GMW's expert testimony, the district court further explained that their testimony "is material *only if* the defendants' conduct caused [GMW] lost profits." *Id.* (emphasis added). But the court found that "the evidence supporting this conclusion is deficient and requires resort[ing] to speculation and conjecture that is inconsistent with observed events and the uncontroverted testimony of third parties." *Id.* As narrated earlier, the court found that the experts did not even directly testify as to causation—with only one of them offering an unsubstantiated opinion that arguably implicates the subject.

Thus, we conclude that the court followed the proper legal standards and issued its decision consistent with those standards. *See Harding v. Atlas Title Ins. Agency, Inc.*, 285 P.3d 1260, 1263 (Utah Ct. App. 2012) ("'[P]roximate cause issues can be decided as a matter of law' in two circumstances: '(i) when the facts are so clear that reasonable persons could not disagree about the underlying facts or about the application of a legal standard to the facts, and (ii) *when the proximate cause of an injury is left to speculation so that the claim fails as a matter of law*.'" (emphasis added) (quoting *Harline v. Barker*, 912 P.2d 433, 439 (Utah 1996))); *see also Pioneer Ctrs.*, 858 F.3d at 1333–34 ("Although causation is generally a question of fact for a jury, where 'the facts are undisputed and reasonable minds can draw only one conclusion from them,' causation is a question of law for the court." (quoting *Berg v. United States*, 806 F.2d 978, 981 (10th Cir. 1986))); *cf. Goebel v. Salt Lake City S. R.R. Co.*, 104 P.3d 1185, 1190

37

(Utah 2004) ("[I]f there is any doubt about whether something was a proximate cause of the plaintiff's injuries, the court must not decide the issue as a matter of law.").

GMW also argues that the district court "ignored the important distinction between inferences and speculation" by "consistently and improperly dr[awing] inferences against" GMW when it found that GMW's "damages scenarios required speculation." Aplt.'s Opening Br. at 47. For support, GMW again turns to Utah caselaw which expounds upon the general standards related to summary judgment motions and causation evidence. *See id.* ("In the case of a reasonable inference, there is at least a foundation in the evidence upon which the ultimate conclusion is based; in the case of speculation, there is no underlying evidence to support the conclusion. Thus, so long as there exists sufficient evidence upon which a reasonable inference regarding proximate cause may be drawn, summary judgment is inappropriate." (underlining and bolding omitted) (quoting *Harding*, 285 P.3d at 1263)).

In this regard, GMW's argument that the court conflated inference with speculation is unpersuasive. Again placing GMW's misguided reliance on Utah summary judgment standards aside for a moment, we observe that *Harding* explains—and GMW itself notes—"in the case of speculation, *there is no underlying evidence to support the conclusion.*" *Harding*, 285 P.3d at 1263 (emphasis added). A more recent decision from the Utah Supreme Court explains

38

further:

> In distinguishing between a reasonable inference and speculation, an "inference is a deduction as to the existence of a fact which human experience teaches us can reasonably and logically be drawn from proof of other facts." Speculation, on the other hand, is the "act or practice of theorizing about matters over which there is no certain knowledge." Of course, "there is no black line between inference and speculation." But a reasonable inference exists when "there is at least a foundation in the evidence upon which the ultimate conclusion is based," while "in the case of speculation, there is no underlying evidence to support the conclusion."

*Heslop v. Bear River Mut. Ins. Co.*, 390 P.3d 314, 321 (Utah 2017) (citations omitted); *see also Salt Lake City v. Carrera*, 358 P.3d 1067, 1070 (Utah 2015) ("In short, the difference between an inference and speculation depends on whether the underlying facts support the conclusion. A jury draws a reasonable inference if there is an evidentiary foundation to draw and support the conclusion. In the case of speculation, however, there is no underlying evidence to support the conclusion.").

As we have noted above, the district court made its causation determination by finding that there was *no evidence* of causation, *not* because it disregarded or weighed certain evidence in favor of Defendants. Indeed, the heart of the matter is the same in both Utah and federal caselaw: A non-moving party may evade summary judgment on the issue of causation by pointing to record evidence from which a reasonable jury could infer a causal nexus between the movant's conduct and the nonmovant's injury; but the nonmovant may not evade summary judgment

39

by speculating about possibilities or hypotheticals that have de minimis to no

support in the record. *See Harding*, 285 P.3d at 1263 ("We acknowledge that

'[j]urors may not speculate as to possibilities; they may, however, make

justifiable inferences from circumstantial evidence to find . . . proximate cause.'"

(alteration and omission in original) (quoting *Lindsay v. Gibbons & Reed*, 497

P.2d 28, 31 (Utah 1972))); *cf. Self v. Crum*, 439 F.3d 1227, 1236 (10th Cir. 2006)

("Inferences supported by conjecture or speculation will not defeat a motion for

summary judgment."); *Phillips v. Calhoun*, 956 F.2d 949, 950 (10th Cir. 1992)

("Unsubstantiated allegations carry no probative weight in summary judgment

proceedings."). And with that in mind, GMW still fails to identify with any

specificity what evidence the court disregarded or weighed in favor of

Defendants. Thus, we conclude that the court did not conflate "speculation" with

"inference," making GMW's contrary assertion unavailing.

**2**

GMW next contends that "the trial court made a fundamental mistake by

ignoring that [GMW's] damages theory was based upon the value of its lost

business, not a pure lost profits analysis." Aplt.'s Opening Br. at 49. We find

this argument unsupported by our review of the record.

Simply put, GMW raised no such "lost business value" theory before the

district court. As a preliminary matter, we note that GMW, in at least one state-

court filing, has acknowledged that this theory was neither presented to nor

considered by the district court. *See* Hall Defs.' Resp. Br. at 57 n.29.

Specifically, in GMW's response in opposition to summary judgment on the basis

of issue preclusion filed in the Third Judicial District of Utah, GMW avers that,

because it "never presented" to the federal district court in the underlying action

here its "alternative damages theory based upon loss of business value"—and the

court never "addressed" that issue—GMW "can and will advance" the theory

before the state trial court. Hall Defs.' Addendum to the Resp. Br. at 93 (GMW's

Opp. to Defs.' Mot. for Summ. J. on Issue Preclusion, dated Oct. 25, 2019). Our

caselaw permits us to take judicial notice of such court filings. *See United States*

*v. Smalls*, 605 F.3d 765, 768 n.2 (10th Cir. 2010) (recognizing a court may take

judicial notice of docket information from another court); *Estate of McMorris v.*

*C.I.R.*, 243 F.3d 1254, 1259 n.8 (10th Cir. 2001) (same). And GMW's concession

is clear enough and establishes that it (at the very least) forfeited this theory.

Even if we set aside GMW's admission, it is clear that GMW, as we have

extensively described above, explicitly proffered only two causation theories: a

lost profits damages theory and an unjust enrichment theory. *See* Aplt.'s App.,

Vol. 9, at 1762–63, 1883–84 (GMW explaining its four damages scenarios under

its lost profits damages and unjust enrichment theories). Nowhere in the record

could we find any mention of a lost business value theory ever being presented to

or considered by the district court. This means that all of GMW's arguments as to

its lost business value theory are forfeited. *See, e.g.*, *Havens v. Colo. Dep't of*

41

*Corr.*, 897 F.3d 1250, 1259 (10th Cir. 2018) ("We ordinarily deem arguments that litigants fail to present before the district court but then subsequently urge on appeal to be forfeited.").  And GMW has not invoked the plain-error framework and argued that the district court's alleged error in disregarding its forfeited causation theory was plain error.  *See, e.g.*, *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011) ("Unlike waived theories, we will entertain forfeited theories on appeal, but we will reverse a district court's judgment on the basis of a forfeited theory only if failing to do so would entrench a plainly erroneous result." (citing *United States v. Zubia-Torres*, 550 F.3d 1202, 1205 (10th Cir. 2008))).  Accordingly, we conclude that GMW's lost business value theory is effectively waived here.  *See, e.g.*, *In re Rumsey Land Co., LLC*, 944 F.3d 1259, 1271 (10th Cir. 2019) ("If an appellant does not explain how its forfeited arguments survive the plain error standard, it effectively waives those arguments on appeal."); *see also Richison*, 634 F.3d at 1131 ("[T]he failure to argue for plain error and its application on appeal . . . surely marks the end of the road for an argument for reversal not first presented to the district court.").

GMW nevertheless attempts to persuade us that, contrary to the record, it actually did preserve a lost business value damages theory.  In trying to demonstrate this, it cites the following appendix excerpts: (1) a portion of GMW's Second Supplemental Damages Disclosure, in which GMW "made clear that 'in the simplest terms, the first category of damages is what [GMW] lost, which is

42

the entire value of its business,'" Aplt.'s Reply Br. at 10 (second alteration in

original) (quoting Aplt.'s App., Vol. 7, at 1346); (2) several pages of its

Opposition to the Hall Defendants' Motion for Summary Judgment, in which

GMW contended, *inter alia*, the Hall Defendants "[m]iscomprehend[ed] [GMW's]

valuation principles," "ignore[d] the thrust of [GMW's] damages theory: but for

the[ir] conduct . . . [GMW's] value would be significantly greater," and GMW's

project would have "had value in late 2013 and early 2014 because of the

project's vast revenue and profit potential," *id.* at 11 (capitalization omitted)

(quoting Aplt.'s App., Vol. 9, at 1871–72, 1878); and (3) GMW's "hearing

handout," in which GMW apparently incorporated its lost business value theory,

*id.*  Yet even in GMW's own descriptions, these references merely allude to a

"lost business value" theory in only the most generic and underdeveloped

terms—especially compared to its briefing on its lost profits damages and unjust

enrichment theories.  Providing generic and underdeveloped theories before us in

written briefing does not preserve such theories and argumentation.

       To preserve an issue for appeal, a party must "alert[] the district court to

the issue and seek[] a ruling"—"[a] party does not preserve an issue merely by . .

. presenting [it] to the district court in a 'vague and ambiguous' manner," or "by

making a 'fleeting contention' before the district court."  *U.S. Aviation*

*Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1142 (10th Cir.

2009) (first quoting *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d

43

1135, 1141 (10th Cir. 2007); and then quoting *Tele-Commc'ns, Inc. v. Comm'r*, 104 F.3d 1229, 1233–34 (10th Cir. 1997)).  And similarly, "[w]e . . . do not address 'arguments raised in the District Court in a perfunctory and underdeveloped manner.'"  *In re Rumsey*, 944 F.3d at 1271 (quoting *Tele-Commc'ns*, 104 F.3d at 1233).

It is thus clear from our caselaw that GMW—even if we give it the benefit of the doubt that it did proffer some sort of a general, underdeveloped lost business value theory in the district court—has still forfeited the theory by its skeletal and inadequate presentation of it, and GMW has effectively waived the theory before us by not arguing for plain error.  *Cf. Lone Star Steel Co. v. United Mine Workers of Am.*, 851 F.2d 1239, 1243 (10th Cir. 1988) ("Ordinarily, a party may not lose in the district court on one theory of the case, and then prevail on appeal on a different theory."); *Stephens Indus., Inc. v. Haskins & Sells*, 438 F.2d 357, 361 (10th Cir. 1971) ("After thoroughly perusing the amended complaint, the pre-trial order, the testimony and exhibits, the jury instructions, and the appellants' main brief, we are satisfied that these expansive arguments were not part of the legal theory upon which the case was tried.  Hence, they are inappropriate for consideration on appeal.").

In its Reply Brief, GMW also pursues another argument related to its lost business value theory for the first time in this litigation without invoking the plain-error doctrine.  Specifically, GMW admits in its Reply Brief that Utah

courts have yet to recognize a "lost business value" damages measure and urges

us to make a prediction—that is, an *Erie*-guess—that the Utah Supreme Court

would recognize such a theory. Aplt.'s Reply Br. at 12–15, 53; *cf. Pehle v. Farm*

*Bureau Life Ins. Co.*, 397 F.3d 897, 901 (10th Cir. 2005) (explaining that,

"[b]ecause Wyoming [courts] ha[ve] not directly addressed this issue, [we] must

make an *Erie*-guess [pursuant to *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)]

as to how the Wyoming Supreme Court would rule"). However, because GMW

did not raise this particular argument involving its lost business value theory in

the district court, nor argue plain error before us, it is effectively waived under

the principles discussed *supra*. *See In re Rumsey*, 944 F.3d at 1271. Moreover, it

also is waived because of its late-blooming introduction in GMW's Reply Brief.

*See United States v. Bass*, 661 F.3d 1299, 1301 n.1 (10th Cir. 2011) (Ordinarily,

"[w]e decline to consider arguments raised for the first time in a reply brief."

(quoting *United States v. Murray*, 82 F.3d 361, 363 n.3 (10th Cir. 1996)));

*Anderson v. U.S. Dep't of Lab.*, 422 F.3d 1155, 1174 (10th Cir. 2005) ("The

failure to raise an issue in an opening brief waives that issue.").

In sum, we decline to consider on waiver grounds GMW's arguments

regarding its purported lost business value theory, including its argument that we

should predict whether the Utah Supreme Court would endorse this theory.

**3**

Next, GMW broadly—and vaguely—avers that the district court "rejected [GMW's] damage scenarios, but ignored evidence, improperly weighed evidence and drew inferences against [GMW]." Aplt.'s Opening Br. at 51. On that point, GMW focuses on its so-called "Scenario 3a," arguing that, "because the trial court literally missed Scenario 3a in its analysis, reversal is proper on this basis alone." *Id.* at 51–52. With respect to "Scenario 3a," GMW explains that it could have obtained support from an unknown third-party and would have retained an unknown alternative to AsiaSat to guarantee an EXIM Bank loan. *Id.* at 53–54.

This argument, too, is unpersuasive. To start, strictly speaking, there was no "Scenario 3a" presented before the district court. *Id.* at 51–52; *cf.* Hall Defs.' Resp. Br. at 47; *GeoMetWatch*, 2018 WL 6240991, at *15. GMW presented a "Scenario 3," and, as outlined earlier, that scenario, as GMW presented it, provides that but for Defendants' illicit conduct:

> The Instrument [would have been] built by [the American Manufacturer,] AsiaSat's payload hosting services [would have been] replaced by a different commercial satellite operator . . . and new equity and debt [would have been] obtained from the marketplace, including possibly through EXIM project financing . . . or through another export credit agency [ ].

Aplt.'s App., Vol. 9, at 1762.

The district court was unpersuaded, finding that, aside from GMW's "unsupported expert opinion" from Jozsef Szamosfalvi—GMW's former CFO

46

who based his opinion on his personal interactions with EXIM Bank—"there is no evidence from which a reasonable juror could conclude that [GMW] could have obtained project financing from the EXIM Bank." *GeoMetWatch*, 2018 WL 6240991, at *15.  So, for purposes of GMW's specific argument now before us, the court did in fact consider—through its disposition of Scenario 3—in substance, what GMW is now calling "Scenario 3a."

GMW nevertheless argues that the district court, in its reasoning, merely disposed of "Scenario 3b" which apparently was only about project financing, and not the scenario in which GMW could obtain "equity."  Aplt.'s Opening Br. at 53.  It avers that the court "literally failed" to address whether GMW could have obtained an "equity investor."  *Id.*

That assertion is misleading.  GMW's own description of Scenario 3 stated that "new equity *and* debt are obtained from the marketplace, *including possibly through* EXIM project financing."  Aplt.'s App., Vol. 9, at 1762 (emphases added).  That phrase indicates that the term "project financing" is a more concrete example of how "new equity and debt" could support GMW.  Particularly, the placement of the comma just right after the word "marketplace" indicates that "EXIM project financing" is an example of how GMW may "obtain" "new equity and debt" "from the marketplace." *See* Antonin Scalia & Bryan Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 161 (1st ed. 2012) (stating that "[p]unctuation is a permissible indicator of meaning" and "[p]unctuation in a

47

legal text . . . will often determine whether a modifying phrase or clause applies to all that preceded it or only to a part").[14]  By finding that GMW failed to provide evidence as to Scenario 3 generally, and as to project financing specifically, the district court was, in effect, holding that GMW did not provide evidence supporting its contention that it could have acquired "new equity and debt."

As the Hall Defendants explain, "GMW referred to its third damages theory *only in the singular*," and the court "analyzed all [of] GMW's damages scenarios *the way GMW presented them*."  Hall Defs.' Resp. Br. at 46 (emphases added). Accordingly, even if GMW did mean to differentiate "debt" from "equity" for purposes of its damages scenarios, it now cannot fault the district court for following how GMW itself presented the scenarios—that is, by grouping "equity and debt" in only one scenario, that is, "Scenario 3."  *Cf. United States v. Edward J.*, 224 F.3d 1216, 1222 (10th Cir. 2000) (noting in the context of criminal trials and proceedings that "[t]he invited error doctrine prevents a party from inducing action by a court and later seeking reversal on the ground that the requested action was error" (quoting *United States v. Johnson*, 183 F.3d 1175,

---

[14]　　Indeed, in order for GMW's reading to be correct, the relevant phrase, among other possible ways, should have been written as: "AsiaSat's payload hosting services are replaced by a different commercial satellite operator . . . and new equity*, and new debt including possibly EXIM project financing,* are obtained from the marketplace . . . ."  But the sentence was not written in that manner.

1178 n. 2 (10th Cir.1999))); *cf. also Ruiz v. Wing*, 991 F.3d 1130, 1140 n.7 (11th Cir. 2021) (applying invited error doctrine in a civil case); *Wharton v. Furrer*, 620 F. App'x 546, 548 (7th Cir. 2015) (unpublished) ("We have applied the invited error doctrine in both civil and criminal cases." (citing *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 609 (7th Cir. 2006); *United States v. Muskovsky*, 863 F.2d 1319, 1329 (7th Cir. 1988))).

At bottom, the district court did provide its conclusions on GMW's Scenario 3—i.e., that GMW could have acquired financing to secure its venture, which included the claim that GMW could have possibly obtained an equity investor.  And the court found that such a scenario was unfounded, stating that "the expert opinions simply 'assume' that [GMW] would have been able to secure financing for its venture despite its inability to do so before the Hall Defendants arrived on the scene." *GeoMetWatch*, 2018 WL 6240991, at *8.  We agree with the district court that "this assumption and others like it rely on nothing more than mere speculation and conjecture that is, in critical respects, directly at odds with the observed conditions faced by [GMW] before the Hall Defendants entered the picture." *Id.*  Thus, there simply is no reason to believe that the district court somehow managed to ignore or overlook an ostensible "Scenario 3a." Accordingly, we conclude that GMW's contrary assertion is unavailing.

GMW additionally claims that there was "abundant evidence" supporting its theory that GMW could have secured "new equity and debt" but for the Hall

49

Defendants' actions.  Aplt.'s Opening Br. at 55.  GMW writes that, "[p]rior to the theft of its trade secrets and destruction of its business by Defendants, [GMW] had spent years and raised and invested approximately $6 million to develop trade secrets and confidential information, such that its project was poised for success, summarized in the opposition to the summary judgment motion, and demonstrated by thousands of pages of evidence."  *Id.* at 55–57.  Supposedly, these "thousands of pages" "demonstrated [that GMW] was positioned for success."  *Id.* at 57.

But these "thousands of pages"—which likewise "inundat[ed] the district court," *see* Hall Defs.' Resp. Br. at 54—do not help GMW's appeal.  Nowhere in GMW's Opening Brief does it actually explain where, why, and how these records serve as evidence in support of causation.  We have a "preference for affirmance," *Richison*, 634 F.3d at 1130, and GMW's general and vague assertions and citations to its thousands of pages of documents do not help it to meaningfully challenge the district court's grant of summary judgment for Defendants—that is, to show that Defendants' actions are to blame for its failure to move forward with AsiaSat.  *See, e.g.*, *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005) ("Plaintiff's briefs are wholly inadequate to preserve issues for review. . . .  [T]he court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." (citations omitted)); *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) ("Nowhere do Plaintiffs state the standards applicable to

the grant of injunctive relief and explain why the facts and the law support that remedy in this case.  Issues not adequately briefed will not be considered on appeal.").

As the Hall Defendants appropriately state, "GMW's mountain of paper does not obscure GMW's failure to satisfy conditions of the Cooperation Agreement or terms of GMW's agreements with other contingent partners."  Hall Defs.' Resp. Br. at 54.  And we agree with the Hall Defendants that this voluminous record "does not support GMW's claim that [they] caused GMW's business failure." *Id.* (emphasis omitted).  In any event, that GMW was "positioned for success" does not answer whether Defendants' actions undermined its ability to follow the provisions of the Cooperation Agreement with AsiaSat—that is, to provide either a backstop or a Convertible Note.  Aplt.'s Opening Br. at 58.  Thus, we reject GMW's argument here.

Still challenging the district court's disposition of Scenario 3, GMW changes tack and homes in on the testimony of two of its experts.  GMW contends that "expert evidence" from Matthew O'Connell and Mark Piegza was sufficient to support Scenario 3.  Aplt.'s Opening Br. at 58.  The two experts, according to GMW, testified that it "had accumulated significant assets, including trade secrets, and had accomplished [numerous] significant milestones." *Id.* at 59.  For example, Mr. O'Connell purportedly explained that these milestones indicated that "[t]he enterprise was sufficiently advanced[,] that it had earmarks for a

51

successful project and therefore could be expected to obtain equity and/or debt financing." *Id.* at 61 (underlining omitted) (quoting Aplt.'s App., Vol. 10, at 2163 (Expert Report of Matthew O'Connell, dated Sept. 22, 2017)).

Those expert opinions, however, still do not speak to whether Defendants' conduct was the cause of GMW's damages. More precisely as to Scenario 3, they do not address whether Defendants caused GMW's failure to obtain new equity and debt. As we noted earlier, both experts explained that they were *not* testifying as to causation. Mr. Piegza testified that causation was outside of the scope of his opinion, answering affirmatively when asked whether he would "admit, though, that there's no discussion in your report of the actions of the [D]efendants in this case," and that those actions were "outside the scope of your opinions." Aplt.'s App., Vol. 22, at 5364–66 (Mark Piegza Dep. Tr., dated Mar. 8, 2018).

Mr. O'Connell likewise noted he did not have an opinion "regarding why" (1) "AsiaSat allowed the [C]ooperation [A]greement to expire"; (2) "AsiaSat ultimately terminated" that agreement; (3) "EXIM Bank never approved a loan for purposes of funding the hyperspectral sensor"; and (4) "AWSF terminated the [STORM 001] contract." *Id.* at 5369 (Matthew O'Connell Dep. Tr., dated Mar. 9, 2018). He also testified that he was "certainly not in the best position to explain why [AsiaSat] terminated [the Cooperation Agreement]." *Id.* at 5370. As we

narrated above, the district court itself noted that the experts did not address

causation.  *See GeoMetWatch*, 2018 WL 6240991, at *9 n.11.

Thus, in our view, Mr. Piegza and Mr. O'Connell's opinions are entirely

irrelevant to the question in this appeal: whether the court erred in finding that

GMW failed to provide evidence that Defendants caused GMW's purported

damages—i.e., that Defendants are to blame for GMW's failure to abide by the

Cooperation Agreement it signed with AsiaSat.[15]

---

[15]    In passing, GMW also states in a footnote the district court erred in excluding Mr. O'Connell's "first-mover advantage" opinion.  Specifically, GMW states that the court erred because "where an expert is qualified and there is evidence (or even an appropriate assumption) to support an opinion, the trial court should not weigh the expert evidence."  Aplt.'s Opening Br. at 62–63 n.22. GMW includes a few citations to cases but nothing else in terms of explanation, discussion, or analysis.

Similarly, GMW subsequently states in its arguments surrounding Scenario 2 that the district court "incorrectly dismissed [GMW's] expert opinions that [GMW] could have found an alternative lender to EXIM as '*ipse dixit*.'"  *Id.* at 87.  As support, GMW merely provides two additional statements:

> For an expert's opinions to be *ipse dixit*, they must be so removed from the data as to create an impermissible analytical gap, i.e. "the conclusion simply does not follow from the data." The opinions about [GMW's] ability to obtain a substitute lender were based upon the same factors that made the [GMW] project ready-for-approval by EXIM from a technical and revenue perspective, and the trial court's dismissive attitude is contrary to the evidence.

*Id.* (quoting *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1233 (10th Cir. 2005)). Nowhere in the Opening Brief does GMW mention or discuss any Federal Rule of Evidence, or even the standard of review that we should utilize in analyzing these short, conclusory arguments.  As we mentioned above, even in addressing

(continued...)

GMW further argues that, "[a]lthough also not addressed by the trial court, Defendants themselves validated the value of [GMW's] project, creating issues of fact as to its value and causation." Aplt.'s Opening Br. at 65. In support of this assertion, GMW alleges that "Defendants' first endorsement of [GMW's] business plan and revenue models came from the years of work by USURF and AWSF[—]who entered into agreements with [GMW], invested time and money with [GMW], and supported [GMW] in multiple ways." *Id.* Then, "Defendants next endorsed [GMW's] business plan and revenue models by stealing and misusing them to create competing business." *Id.* at 66.

Moreover, GMW asserts that "[e]verything Tempus had was derived from [GMW's] information, and Tempus would not have existed but for the theft." *Id.* As further evidence, GMW refers to Mr. "Hall's own emails reflect[ing] his concern [GMW] would succeed—with or without—AsiaSat—leading him to write that he 'need[ed] to put the last nail in [GMW's] coffin' because he couldn't 'leave them thinking they are still in the game,' that he had a plan to make sure 'the competition will be devastated' (to which a [Utah State University] employee

---

[15](...continued)
contentions of a pro se litigant, "the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." *Garrett*, 425 F.3d at 840. We perforce will not do so here, given that GMW is represented by counsel. Thus, we find these arguments "insufficiently raised" and deem them waived. *Becker v. Kroll*, 494 F.3d 904, 913 n.6 (10th Cir. 2007); *see also Kitchen v. Herbert*, 755 F.3d 1193, 1213 n.6 (10th Cir. 2014) (an issue is waived when raised "in a footnote and in conclusory fashion").

responded 'that is a perfect plan of attack'), and that his plans included that 'GMW burns in hell.'"  Aplt.'s Opening Br. at 67 (underlining omitted) (quoting Aplt.'s App., Vol. 9, at 1867–68).

We reiterate, however, that we do not see how we can infer a link between Defendants' actions and GMW's damages even if we do acknowledge that Mr. Hall's emails were inflammatory and that Defendants did see *some* value in partnering with GMW.  As the Hall Defendants succinctly state, "these unflattering (even inflammatory) materials and actions are irrelevant" because "GMW fails to provide evidence connecting them to GMW's alleged lost profits." Hall Defs.' Resp. Br. at 55–56.  What is missing here, and indeed throughout this appeal, is the connection between Defendants' alleged bad acts and GMW's failed venture.

GMW, effectively, "had to, but did not, proffer admissible evidence establishing that GMW's prospective venture partners . . . were actually motivated to abandon GMW" due to Defendants' illicit conduct.  *Id.* at 56.  In the end, despite Mr. Hall's negative emails and the creation of Tempus, there is still no causal link between those actions and GMW's failure to abide by the Cooperation Agreement it entered into with AsiaSat.  *Cf. Canyon Country Store v. Bracey*, 781 P.2d 414, 419 (Utah 1989) (affirming jury award of lost profits to the plaintiff's grocery business because, among other things, it provided evidence convincing the jury that, "had the insurers paid the claim promptly, Canyon

55

Country would have been able to continue and conduct business profitably");
*Warnick*, 664 P.2d at 1165 (finding that a causal nexus existed between a company's lost profits and a manufacturer's failure to timely supply silos because, "[d]espite repeated follow-up contacts by [the company], the final shipment of parts for the silos was not received until almost a year after it was promised"; "[o]nce the parts were received and modified, the plant quickly became operational, earning its first profits within a month"; and [an owner of the company] testified that operations could have commenced 8 months sooner if the parts had been sent earlier"); *cf. also Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 336 (Utah 1985) (holding that plaintiff law firm failed to establish that its reduction in gross income was caused by the negligent operation of the intercept by a defendant telephone company because, among other things, merely showing that the law firm's quarterly gross revenues decreased for a three month period when the negligent operation happened "does not establish that it was the occasionally malfunctioning intercept which caused the reduced revenues" and such an inference would only be "speculative," especially in light of the fact that the "incomes of law firms generally fluctuate from year to year and throughout the months of each year").

Thus, we find its contention that we can reasonably infer causation—that is, the connection between Defendants and GMW's failed venture and lost profits—to be unavailing.

56

**4**

We now move on to GMW's arguments regarding Scenario 1 of its lost profits damages theory. Recall that, under Scenario 1, GMW claims that "[t]he Instrument [would have been] built by [AWSF], AsiaSat [ ], [would have] provide[d] an equity investment and project support as reflected in the Cooperation Agreement, and the [EXIM Bank] [would have] provide[d] financing based upon AsiaSat's pledge of its balance sheet, which AsiaSat conditioned upon an acceptable backstop to mitigate the financial risk associated with the Instrument[,]" *but for* Defendants' illicit conduct. Aplt.'s App., Vol. 9, at 1762.

To start, GMW again asserts that the district court "improperly weighed evidence, ignored evidence, and misapplied law" when it determined that AsiaSat would likely not have waived the backstop requirement and GMW would likely not have provided the Convertible Note. Aplt.'s Opening Br. at 68–69. But GMW proffers nothing—no facts, no caselaw, and no citations to the record—to counter the court's conclusions.

GMW's failure to support its Scenario 1 assertions was initially observed by the district court:

> [GMW] does not even address whether it would have been able to provide a convertible note to AsiaSat. Thus, even assuming that AsiaSat were willing to waive the backstop requirement (it was not), there is no evidence that [GMW] was able to provide AsiaSat with a convertible note, and therefore AsiaSat would not have triggered the loan process.

57

*GeoMetWatch*, 2018 WL 6240991, at \*12 (footnote omitted).  Now on appeal, GMW has not contested that finding aside from its ineffective, bald assertion quoted *supra*.  Thus, we find that GMW's argument is waived because it is inadequately briefed.  *See Becker v. Kroll*, 494 F.3d 904, 913 n.6 (10th Cir. 2007) ("An issue or argument insufficiently raised in the opening brief is deemed waived."); *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief."); *see also Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1366 (10th Cir. 2015) (noting that "[t]he first task of an appellant is to explain to us why the district court's decision was wrong").

In any event, we nevertheless conclude that GMW's claims related to Scenario 1 are unfounded in the record, since there is actual evidence of GMW's reluctance to even provide the Convertible Note in the first place.  Specifically, GMW previously stated in internal documents that issuing the Convertible Note with a conversion price as prescribed by AsiaSat would make investing in GMW "very unattractive for investors to buy in to the level of dilution that [t]his [N]ote represents, and it will be tough to justify any particular valuation."  Aplt.'s App., Vol. 46, at 10804 (GMW's Convertible Note Issues List, dated Aug. 16, 2013).  Mr. Crain—one of GMW's co-founders—similarly testified that he thought AsiaSat was taking a "very strong position" in negotiations to see if they could

58

"move" GMW's position, especially because the Convertible Note, and other conditions, "are onerous conditions [GMW] *likely can never satisfy*."  *Id.* at 10817–18 (David Crain Dep. Tr., dated Dec. 7, 2016) (emphasis added).

And Mr. Crain further testified that GMW "had counsel advice" that GMW could not accept the Convertible Note requirement—evincing that GMW was willing to let its deal with AsiaSat lapse.  *Id.* at 10818.  Thus, in light of the lack of evidence supporting GMW's conclusion that AsiaSat would have waived the backstop or Convertible Note requirements, along with evidence that establishes that GMW was reluctant, at the very least, to issue a Convertible Note, we hold that the district court did not improperly weigh or ignore the evidence when it ruled in favor of Defendants.

GMW also argues that we should infer that AsiaSat would have waived the requisite conditions precedent in the Cooperation Agreement because, as even the district court noted, "'there [was] a slim *possibility* AsiaSat would have been willing to waive both [the] requirements' of a backstop and the convertible note." Aplt.'s Opening Br. at 69 (quoting *GeoMetWatch*, 2018 WL 6240991, at *13). Reading that statement, GMW thinks that the court "[c]onceded" that there was evidence bolstering GMW's position.  *Id.* (emphasis omitted).  GMW explains that if the record reflects "even the possibility" of a factual dispute, then summary judgment must be denied.  *Id.* (emphasis omitted) (citing *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1095 (Fla. Dist. Ct. App. 1999); *Nay v. Gen. Motors Corp.,*

*GMC Truck Div.*, 850 P.2d 1260, 1264 (Utah 1993); *C.S. Hammond & Co. v. Int'l*

*Coll. Globe Inc.*, 146 F. Supp. 514, 516 (S.D.N.Y. 1956)).

But GMW's assertions misread both the district court's explanation and its

own cited caselaw.  The court accompanied its "slim-possibility" statement with a

footnote stating that:

> [A]ny causation theory that asserts, *without evidence*, that a
> counterparty might have abided [GMW's] breach, cannot be
> sustained.  If any party could come to court in a contract case and
> successfully assert counterfactual scenarios involving the
> benevolence of counterparties in excusing non-performance, the
> law of contracts would be turned on its head.

*GeoMetWatch*, 2018 WL 6240991, at *13 n.16 (emphasis added).

Thus, the court qualified that there was indeed *no* evidence to sustain

GMW's central thesis for causation in this case.  That there was a "slim

possibility" that AsiaSat was willing waive the provisions of the Cooperation

Agreement was not based on any piece of evidence or fact.  The court was thus

correct in disregarding whatever "slim possibility" was present because such a

"slim possibility" amount to unsubstantiated speculation, which must not be

considered in summary judgment proceedings.  *See, e.g.*, *Hasan*, 935 F.3d at 1098

("Unsubstantiated allegations carry no probative weight in summary judgment

proceedings." (quoting *Bones*, 366 F.3d at 875)); *Genzer*, 934 F.3d at 1160

(noting that a nonmovant cannot "defeat summary judgment by relying on

'ignorance of the facts, on speculation, or on suspicion'" (quoting *Conaway*, 853 F.2d at 794)).

Likewise, turning to GMW's caselaw—even putting aside the fact that it does not bind us—it appears to be quite consistent with our federal summary judgment standards enunciated above. In particular, this caselaw seems to indicate that the kind of "possibility" of a factual dispute that would permit a party to survive summary judgment only would be one that is *grounded in evidence*. *See Cox*, 732 So. 2d at 1095 ("*If the record* reflects even the possibility of a material issue of fact, or if different inferences can be drawn reasonably *from the facts*, that doubt must be resolved against the moving party and summary judgment must be denied." (emphases added)); *Nay*, 850 P.2d at 1264 ("We refuse to prevent [causation] issues from going to the jury when, as here, *there is any evidence* upon which a *reasonable* jury could infer causation." (emphases added)); *Hammond*, 146 F. Supp. at 516 ("It has been clearly established that where there is any possibility that an *issue of fact* is presented, the opposing party should have the opportunity to cross examine movant's witnesses and the trier of the facts should have the opportunity to evaluate their credibility by observing their demeanor while they testify." (emphasis added)). Thus, the three cases GMW cites are of no assistance to its arguments as to this issue.

In this case, as the district court observed, GMW's assertions about Defendants' bad acts and how they caused the failure of its venture with AsiaSat

61

are not grounded in any fact or evidence in the record.  Given our standards of review, that is fatal to GMW's cause.  As the First Circuit aptly observed, "[t]he test for summary judgment is steeped in reality," meaning that, "[a]lthough the remedy must be withheld if material facts are authentically disputed, there is a burden of production: the party opposing the motion 'must set forth specific facts showing that there is a genuine issue for trial.'"  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (quoting FED. R. CIV. P. 56(e)) *abrogated on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993).  And "[e]ven in cases where elusive concepts . . . are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable defenses, and unsupported speculation."  *Id.*  Thus, with these principles in mind, we do not think that the district court acknowledged or admitted that there was *evidence* supporting GMW's averment that there exists a "slim possibility" that AsiaSat would have waived the Cooperation Agreement's requirements.  Accordingly, we find GMW's argument unavailing.

GMW next asserts that AsiaSat and AWSF abandoned GMW only after Mr. Hall used GMW's confidential information to provide them with better business offers.  *See* Aplt.'s Opening Br. at 70.  Essentially rehashing its arguments related to Scenario 3, GMW again focuses on Mr. Hall's November 3, 2013, email as the turning point of GMW's partnership with AsiaSat.  Prior to that email, argues

GMW, "AsiaSat was enthusiastic about getting the Convertible Note signed and moving forward with the project." *Id.* at 71. GMW cites an October 15, 2013, email AsiaSat wrote to GMW that apparently shows this positivity and promise. *Id.* But, "after gaining access to [GMW]'s confidential information," Mr. Hall in early November 2013 developed a so-called "Replace and Destroy Plan" to take AsiaSat—and the venture—away from GMW. *Id.*

Again, GMW's reliance on these Hall emails is unavailing. There is still no link between GMW's lost profits and Mr. Hall's November 3, 2013, email. Specifically, even if we assume AsiaSat was still enthusiastic about the deal in October 2013, that same email shows that AsiaSat would *still* not have waived the backstop or the Convertible Note requirement—or even been more flexible with the requirements. As AsiaSat stated:

> Following the very positive and promising meetings last week . . . *we would like to move to conclude the Convertible Note agreement and the outstanding CPs* [i.e., "conditions precedent"] so as to be able to move forward with both the Exim process and initial direct funding at the earliest possible moment.

Aplt.'s App., Vol. 45, at 10730 (GMW's Mot. for Consideration of Supplemental Material in Resp. to the Hall Defs.' Summ. J. Mot., dated Aug. 31, 2018) (emphasis added).

Further undercutting any speculation that Mr. Hall's emails were to blame for AsiaSat cutting its ties with GMW, AsiaSat's Mr. Wade testified that the two reasons AsiaSat did not continue with GMW were "because we had[] n[o]t

received the guarantees," and "because we were facing a deadline." Aplt.'s App., Vol. 7, at 1489 (William Wade Dep. Tr., dated Jan. 18, 2017). Nowhere in GMW's thousand-page record does AsiaSat state that it was actually Mr. Hall or any of the other Defendants that influenced its decision to cut GMW loose.

Moreover, recall that GMW's inability to perform and satisfy the Cooperation Agreement's conditions was the influential key to AsiaSat taking affirmative steps to delay and halt the loan approval process in July 2013—almost "two months before" Mr. Hall was introduced to GMW. *GeoMetWatch*, 2018 WL 6240991, at *13. Mr. Crain himself testified that, if AsiaSat was not willing to waive the Convertible Note requirement, they were willing to let the AsiaSat deal lapse and thought that GMW "got other opportunities" if they "can't close this [C]onvertible [N]ote." Aplt.'s App., Vol. 46, at 10818. Thus, while GMW could very well argue that AsiaSat was still enthusiastic about the deal in October 2013, there is no evidence showing that it was willing to waive the Cooperation Agreement's conditions in order for the venture to move forward.

Indeed, it is clear from AsiaSat's own words and actions, along with GMW's stated preference to let the deal lapse if AsiaSat stood firmly behind the conditions precedent, that the parties were not willing to waive (on AsiaSat's part) or accomplish (on GMW's part) any of the conditions—effectively "contradicting" GMW's bald speculations that AsiaSat would have waived the conditions or that GMW would have satisfied them but for Defendants' bad acts.

64

*Rapid Transit Lines, Inc. v. Wichita Devs., Inc.*, 435 F.2d 850, 852 (10th Cir. 1970) (affirming summary judgment on damages allegedly suffered from an eviction because nonmovant stated before the district court that it had no evidence to contradict movants' evidence supporting their motion for summary judgment).

As well, GMW makes much of *XTec, Inc. v. Hembree Consulting Servs., Inc.*, 183 F. Supp. 3d 1245 (S.D. Fla. 2016), a case that purportedly bolsters GMW's central argument in this appeal: that we can reasonably infer that it was Defendants' bad actions that caused the collapse of GMW's venture with AsiaSat. In that case, a plaintiff software company, XTec, claimed that the defendants caused it damage by interfering with XTec's deal with its customer, the U.S. Navy. *Id.* at 1251. For the purposes of this appeal, GMW submits that, in *XTec*, a jury rejected the defendants' argument that it was XTec's fault that the Navy stopped doing business with them. Aplt.'s Opening Br. at 74–75. The defendants in *XTec* argued that the Navy would not have continued its business with XTec unless it satisfied a certain condition, which XTec refused to do. 183 F. Supp. 3d at 1261. The jury nevertheless inferred that it was the defendants' "self-serving tactics" that "pushed X[T]ec out of its relationship with the Navy." *Id.* at 1261 n.6. GMW latches on to that point and argues that Defendants here acted similarly to those in *XTec*. Aplt.'s Opening Br. at 74–75.

GMW, however, forgets to tell us that the condition XTec refused to satisfy was a *newly added*, *non-contractual* condition that the Navy attempted to add

65

subsequent to the original agreement it had with XTec.  *See XTec*, 183 F. Supp. 3d at 1260.  That is remarkably different from the instant action, where GMW spent months unable to fulfill its original contractual obligations—conditions that the parties entered into before Mr. Hall or the Hall Defendants even came into the picture.  Unlike the Navy, AsiaSat did not impose anything new on GMW after talking with Mr. Hall or any of the other Defendants.  AsiaSat simply moved on after GMW failed to satisfy its duties under the Cooperation Agreement.  Thus, we find that the holding and analysis in *XTec* does not help us see things GMW's way.

GMW then stages another similar attack on the district court's allegedly improper inferences on whether AsiaSat could have waived or reduced the backstop requirement.  Aplt.'s Opening Br. at 76.  This time, according to GMW, AsiaSat in yet another email actually notified Mr. Hall that, "under certain circumstances, 'the [backstop] guarantee could be reduced and ultimately removed before any risk attaches.'"  *Id.* (alteration in original) (underlining and bolding omitted) (quoting *GeoMetWatch*, 2018 WL 6240991, at \*12).  With that piece of evidence, GMW argues that "[t]his single email creates an issue of fact about AsiaSat's willingness to waive the backstop."  *Id.*  As GMW reasons, the email is thus evidence that AsiaSat was indeed willing to waive one of the Cooperation Agreement's conditions, and could have waived it for GMW but for Mr. Hall's interference.

66

GMW fails to persuade us.  As the district court noted, GMW's argument

as to this email is wildly taken out of context.  Mr. Hall on November 4,

2013—just a day after the November 3, 2013, email in which he goes against

GMW and invites AsiaSat to do business with him—asked Mr. Wade at AsiaSat if

it is "appropriate and possible for me to work directly with [EXIM] Bank."

Aplt.'s App., Vol. 15, at 3636 (Email from Alan Hall to William Wade, AsiaSat,

dated Nov. 4, 2013).  If so, Mr. Hall represented that he "would assume the

obligations."  *Id.*  The full response from AsiaSat was:

> *If* you are willing to explore the loan obligation[,] we can
> certainly work with you to come up with a workable solution that
> will kick start the project.  I think *once we confirm a number of
> commitments*, the guarantee could be reduced and ultimately
> removed before any risk attaches.

*Id.* (emphases added) (Email from William Wade, AsiaSat, to Alan Hall, dated

Nov. 4, 2013).

In light of AsiaSat's response, it is clear that a reduction or removal of the

backstop was something AsiaSat was prepared to consider in certain

circumstances, if other conditions were met—including the assumption by another

of debt obligations.  However, GMW did not make any offer to AsiaSat like Mr.

Hall's to assume debt obligations.  Indeed, in October 2013, AsiaSat was still

pressing GMW regarding the *existing* commitments—i.e., to "move to conclude

the Convertible Note agreement and the outstanding CPs so as to be able to move

forward with both the Exim process and initial direct funding at the earliest

possible moment." *Id.*, Vol. 45, at 10730. Accordingly, we find that the email is unhelpful to GMW's arguments because AsiaSat's flexibility on the backstop was in response to Mr. Hall's willingness to "assume the obligations." *Id.*, Vol. 15, at 3636. Therefore, in light of the evidence, GMW cannot reasonably argue that AsiaSat would have waived the backstop requirement but for Mr. Hall's illicit conduct.

Not giving up, GMW points to another supposed piece of evidence to argue that AsiaSat was willing to waive the backstop—a declaration from Mr. Crain in which he testifies that, "[p]rior to the Hall Defendants' introduction to [GMW], [AsiaSat officers including Mr. Wade] discussed with me AsiaSat requiring less than the full backstop, or possibly waiving that condition [] altogether." *Id.*, Vol. 10, at 1910 (David Crain Decl., signed Jan. 22, 2018). GMW asserts that "the fact AsiaSat had communicated about 'requiring less than the full backstop, or possibly waiving that condition entirely,' clearly supports an inference that AsiaSat would in fact have done so, but for Defendants' actions." Aplt.'s Opening Br. at 77 (quoting Aplt.'s App., Vol. 10, at 1910).

We find that GMW reads too much into Mr. Crain's statement. Even if AsiaSat was willing to waive the backstop months before Mr. Hall entered the narrative, there is still no evidence that the Hall Defendants caused AsiaSat to not follow through on that willingness.

Moreover, Mr. Crain's statement does not speak as to whether AsiaSat would have actually waived the backstop. Put simply, just because Mr. Crain and AsiaSat *discussed* the backstop does not mean AsiaSat was more likely to have waived that requirement. And indeed, the sequence of events here shows that, assuming that such a discussion between Mr. Crain and AsiaSat did happen, AsiaSat never waived or showed flexibility with the backstop condition even before Mr. Hall came into the picture. Mr. Crain himself testifies that, although AsiaSat extended the deadlines as to the conditions in the Cooperation Agreement, he "presented options that AsiaSat did not accept . . . for the backstop." Aplt.'s App., Vol. 11, at 2304–05 (David Crain Dep. Tr., dated Jun. 30, 2016). Mr. Crain continues that "[i]t's not that [GMW] didn't provide anything. It's just [that AsiaSat] didn't think it was good enough." *Id.* at 2305. And when Mr. Wade was asked whether "anyone from AsiaSat ever t[old] [GMW] that it would consider waiving the requirement for a guarantee to cover the EXIM loan," Mr. Wade replied, "[n]ot to my knowledge." *Id.*, Vol. 7, at 1452.

Similarly, when asked whether "anybody at AsiaSat ever t[old] anybody at [GMW] that AsiaSat would consider waiving the requirement for credit support to cover the [C]onvertible [N]ote loan," Mr. Wade also responded, "[a]gain, not to my knowledge." *Id.* at 1453. As a result, GMW's unfounded speculation that AsiaSat would have waived the backstop condition because it discussed that

69

possibility with Mr. Crain is undercut by actual evidence showing that those discussions yielded not the slightest inkling of a waiver, reduction, or flexibility.

The same can be said with respect to GMW's arguments as to the Convertible Note condition.  Like its backstop assertions, GMW avers that AsiaSat was willing "to waive or retreat from its hard-line position on the [C]onvertible [N]ote (which began only after [Mr.] Hall had made more generous offers to AsiaSat)."  Aplt.'s Opening Br. at 80.  The district court's error here, GMW again rehashes, is its inappropriate weighing of the evidence that lead it to draw inferences against GMW and ignore contrary evidence.  *Id.*

Aside from a misguided reference to *XTec* (for reasons discussed *supra*), however, GMW merely states that "the jury could find AsiaSat's position was to create a pretext to end its relationship with [GMW] so it could take a better offer from [Mr.] Hall."  *Id.* at 80–81.  This argument holds no water for the simple fact that the Convertible Note requirement was part of the Cooperation Agreement which, unlike the relevant condition in *XTec*, was executed way before Mr. Hall ever entered the scene.  Indeed, it was GMW who apparently thought that AsiaSat was bluffing in their negotiations, and to that point, GMW was ready to let the deal fall through—or "move on" in Mr. Crain's words—if the parties "can't close this [C]onvertible [N]ote."  Aplt.'s App., Vol. 46, at 10818.

Finishing up its arguments as to Scenario 1, GMW attempts to be more specific and rattles off a supposed list of evidence the district court ignored in

70

rejecting GMW's argument "that, but for Defendants' actions, AsiaSat would have continued to do business with [GMW], and would have waived the backstop requirement and completed the [C]onvertible [N]ote." Aplt.'s Opening Br. at 81. GMW again provides no explanation as to why the evidence it lists is meaningful and significantly moves the needle in its favor as to the matter at hand. *See id.* at 81–82.

A sampling from this unexplained list includes purported evidence showing that GMW and AsiaSat "had expressly contemplated the possibility of a waiver"; AsiaSat and AWSF supposedly "worked for a long time" with GMW "until [Mr.] Hall came along"; Utah State University "invested $2 million in cash in [GMW]"; and AsiaSat had previously "extended the Cooperation Agreement." *Id.* However, like other GMW arguments we have tackled here, this is yet another inadequately briefed argument. *See, e.g.*, *Pilatus*, 582 F.3d at 1142; *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1133 n.4 (10th Cir. 2004) ("Scattered statements in the appellant's brief are not enough to preserve an issue for appeal."); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) (finding that plaintiff's appellate arguments are inadequately briefed, and are thus waived, because plaintiff "makes only two assertions, without citation to authority or the record," to support her arguments); *see also McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient

71

for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." (omission in original) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regul. Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995))).  Accordingly, we find that GMW's "bald assertion[] . . . that there are genuine issues of material fact [is] insufficient to merit reversal of summary judgment."  *Adler*, 144 F.3d at 679.

At bottom, GMW largely complains that AsiaSat followed the letter and spirit of the Cooperation Agreement and chose not to deviate from it to accommodate GMW's failure to satisfy that agreement's conditions.  Even if we generously assume that such an argument is reasonably brought, GMW still does not provide any evidence whatsoever showing that Mr. Hall influenced AsiaSat to include the conditions precedent in the Cooperation Agreement, follow that agreement to the letter, or enforce it in the way the parties originally contemplated, such that AsiaSat could cut ties with GMW in November 2013.  Thus, GMW's claim that AsiaSat's "hardline" position on the Cooperation Agreement's conditions precedent began only after Mr. Hall interfered with the venture is a bald assertion contradicted by the record.  *See Becker*, 494 F.3d at 913 n.6.  Accordingly, we conclude GMW's arguments as to Scenario 1 of their lost profits damages theory are unfounded and unavailing.

**5**

With Scenarios 3 and 1 discussed, GMW briefly turns to two arguments regarding Scenario 2 of its lost profits damages theory. Recall that, in Scenario 2, GMW argued that, but for Defendants' bad acts, "[t]he Instrument [would have been] built by [the American Manufacturer,] AsiaSat [would have] provide[d] an equity investment and project support as reflected in the Cooperation Agreement, and EXIM [would have] provide[d] financing based upon AsiaSat's pledge of its balance sheet, which AsiaSat conditioned upon an acceptable backstop to mitigate the financial risk associated with the Instrument." Aplt.'s App., Vol. 9, at 1762.

First, in two sentences, GMW rehashes its arguments regarding the backstop and the Convertible Note, summarily stating that, "[f]or the same reasons as with Scenario 1, this analysis is erroneous." Aplt.'s Opening Br. at 83. No additional argument is given and no other facts are referenced. Accordingly, for the reasons explained above, we find GMW's regurgitation of its backstop and Convertible Note arguments to be unavailing.

Second, GMW shifts its focus to the district court's determination that GMW could not have obtained project financing under Scenario 2 and its conclusion that such a scenario was entirely speculative. *Id.* at 83–84. GMW argues that the court "missed the point" that GMW "could have achieved project financing within 6 to 12 months." *Id.* at 84 (emphasis omitted) (quoting Aplt.'s App., Vol. 10, at 1947). It claims that the court discounted the purported expert

73

testimony of Mr. Szamosfalvi—GMW's former CFO—"derogatorily calling his opinions a 'guess,' and rejecting his opinions" because they were apparently contradicted by EXIM Bank's representative, Christine Fogt.  *Id.* at 84–85 (quoting *GeoMetWatch*, 2018 WL 6240991, at \*14).  Ms. Fogt testified that EXIM Bank's discussions with GMW revolved around GMW's partnership with AsiaSat; in her own words, "the discussion was always focused to have [GMW] in partnership for this business proposal or the weather sensor to be a payload onto a satellite with AsiaSat."  Aplt.'s App., Vol. 8, at 1556–57 (Christine Fogt Dep. Tr., dated Feb. 8, 2017).  Simply put, Ms. Fogt represented that "there was no merit" to the idea that any prospective financing for GMW's venture was "to be a project finance deal."  *Id.* at 1557.

We find that GMW, again, offers an unpersuasive argument.  GMW merely cites its former CFO's testimony to bolster its position that EXIM Bank "would likely have agreed to project financing."  *GeoMetWatch*, 2018 WL 6240991, at \*14.  In other words, Mr. Szamosfalvi surmises that EXIM Bank could have provided GMW with its needed funds—in the form of project financing—*regardless* of whether AsiaSat was still part of the financing deal.  *See* Aplt.'s App., Vol. 10, at 1946–48 (Mr. Szamosfalvi explaining that GMW "would have negotiated the terms of project financing with EXIM Bank throughout the process, and sought [an] agreement upon loan terms based upon 'Conditions Precedent' . . . . [when GMW] obtain[s] firm commitments [from other entities]

74

for between 50% to 75% of the revenue needed"; and, among other things, "one very important customer . . . was willing to enter into a firm purchase commitment to purchase a sub-set of data from [GMW], *before* the AsiaSat loan was submitted to EXIM" (emphasis added)).  Mr. Szamosfalvi, in turn, claimed to have based that opinion on interactions with EXIM Bank both in his role as CFO of GMW and his prior transactions with the bank.  By relying on Mr. Szamosfalvi's opinion, GMW relies on nothing more than pure speculation.

As the district court explained:

> No reasonable juror could conclude that [GMW] could have obtained project financing from EXIM Bank [with or without AsiaSat] because [GMW's] sole basis for this argument is expert testimony submitted by its former CFO that is based upon assumptions and opinions that are directly contrary to the undisputed facts.

*GeoMetWatch*, 2018 WL 6240991, at *14.

There was just no evidence—other than a former GMW official's bare assertion—that GMW could obtain project financing from EXIM Bank even if AsiaSat did not continue with the finance deal and the venture fell through.  As we explained earlier, once movants satisfy their burden to establish "that there is an absence of evidence to support the nonmoving party's case," *Clinger*, 215 F.3d at 1165 (quoting *Thomas*, 48 F.3d at 484), nonmovants must "identify *specific* facts that show the existence of a genuine issue of material fact." *Id.* (emphasis added) (quoting *Thomas*, 48 F.3d at 484).  And, unfortunately for

75

GMW, "'statements of mere belief' . . . must be disregarded" at the summary judgment stage. *Argo*, 452 F.3d at 1200 (quoting *Tavery*, 32 F.3d at 1427 n.4). That is, "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings." *Hasan*, 935 F.3d at 1098 (quoting *Bones*, 366 F.3d at 875).

Accordingly, that GMW's former CFO *believed*—without objective evidence to support that belief—that EXIM Bank would have agreed to project financing is irrelevant to the issue because EXIM Bank itself proffered statements showing that any potential financing would not be structured as a project finance deal, and that there were no negotiations about any type of financing with GMW *without* AsiaSat's participation.

Particularly, Ms. Fogt explained that GMW could not "have applied for a loan under the project finance structure" pursuant to the discussions it had with EXIM Bank because (1) EXIM Bank's negotiations with GMW "always focused to have [GMW] in partnership for this business proposal or the weather sensor to be a payload onto a satellite with AsiaSat"; (2) EXIM Bank's "understanding" as to the potential finance deal "was just to be a corporate direct loan transaction" founded on "AsiaSat being an existing company [which] ha[d] been in operation for many years"; (3) the potential finance deal was not "set up with the understanding that repayment or evaluation repayment would only be strictly based on future revenues of [GMW's] project under a project finance deal"

76

structure; and (4) "[t]he repayment of the loan" was understood to "be from an existing company [AsiaSat] with an established history a[s] it was a corporate direct loan." *See* Aplt.'s App., Vol. 8, at 1556–57.

Facing Ms. Fogt's testimony, GMW needed to proffer "evidence, including testimony" that is "based on more than mere speculation, conjecture, or surmise." *Hasan*, 935 F.3d at 1098 (quoting *Bones*, 366 F.3d at 875). By merely proffering Mr. Szamosfalvi's belief on the matter, without anything more, GMW failed to establish a genuine issue of material fact that EXIM Bank would have worked with GMW to obtain project financing—with or without AsiaSat's participation—but for Defendants' illicit conduct.

Specifically, GMW fails to proffer evidence that would dispute Ms. Fogt's testimony and establish that Mr. Szamosflavi's belief is more than "a guess or mere possibility." *Pioneer Ctrs.*, 858 F.3d at 1334 (quoting *Bowen*, 527 F.3d at 1076). Mr. Szamosflavi himself was "unable to explain the terms on which the EXIM Bank would have offered project financing," a point that the district court pointed out in its decision, and one which GMW does not challenge in this appeal. *GeoMetWatch*, 2018 WL 6240991, at *14. To be sure, GMW states Ms. Fogt "never said EXIM *would not have* considered a revised or new application for project financing in the future." Aplt.'s Opening Br. at 85 (emphasis added) (emphasis and footnote omitted). But such an argument reflects a fundamental misunderstanding of the nonmovant's summary judgment burden: as nonmovant,

77

GMW was obliged to raise a genuine dispute of material fact based on record evidence that EXIM Bank *would have* considered a revised application for project financing. And GMW failed to do so.

In other words, even if Ms. Fogt did not definitively answer whether EXIM Bank would consider structuring a deal with GMW through project financing and without AsiaSat's participation—and we observe that Ms. Fogt clearly testified that the *sole* focus of discussions were on issues regarding GMW's prospective partnership with AsiaSat, *see* Aplt.'s App., Vol. 8, at 1556–57—GMW proffers no evidence showing that EXIM Bank would *actually* consider and *then most likely approve* such a financing structure, aside from a former GMW official's unfounded belief. That is not enough. Thus, like the district court, we find GMW's arguments as to Scenario 2 to be meritless.

\*\*\*

At bottom, GMW's arguments as to Issue 1 of this appeal—i.e., whether the district court erred in finding a lack of evidence supporting causation—fail because GMW leaves uncontested that: (1) GMW never provided AsiaSat the guarantee or backstop that was crucial to their deal; (2) GMW neither provided AsiaSat the contractually-required Convertible Note, upon which AsiaSat's performance was conditioned, nor even attempted or intended to do so, in spite of the plain language of the Cooperation Agreement; (3) AsiaSat had suspended the EXIM Bank loan process months before the Hall Defendants entered the scene;

(4) GMW never made its first contractual payment to AWSF; (5) the American

Manufacturer never agreed to provide the guarantee under the Cooperation

Agreement or build the STORM sensor; and (6) AsiaSat never agreed to even a

hypothetical arrangement involving it, GMW, and the American Manufacturer.

Critically, GMW—to its detriment—does not effectively argue that the conduct of

any of Defendants prevented it from (a) obtaining the guarantee or backstop,

(b) providing AsiaSat with the Convertible Note, or (c) making the first

contractual payment to AWSF.

In short, GMW leaves undisputed the facts that establish that it was its *own*

failures—occurring even before the Hall Defendants arrived—that destroyed its

own venture.  Significantly, GMW's venture was already on life-support when

Mr. Hall's inflammatory November 3, 2013, email was sent.  At that point in the

chronology of events, AsiaSat had twice extended the conditions precedent

necessary for the deal to push through.  That remains undisputed, and the idea

that Mr. Hall was to blame for AsiaSat finally pulling the plug on the deal

remains unfounded.

Thus, for all these reasons, we cannot conclude that the court erred in

finding that there was no evidence showing that the cause of GMW's lost profits

was the conduct of Defendants—particularly, the Hall Defendants.  The legal

standards the district court used were appropriate.  GMW's arguments as to its

damages scenarios are waived, meritless, or unfounded in the record.  The record

79

and the facts themselves surely indicate it was GMW's inability to satisfy the Cooperation Agreement that was the cause of any of its lost profits from the failed venture. And GMW did not proffer any contradictory evidence against those facts. Accordingly, we find the district court did not err in awarding summary judgment in favor of Defendants as to the causation issue.

**B**

We next turn to GMW's second issue in this appeal: whether the district court erred in finding that USURF, AWSF, and Mr. Roberts were immune from suit pursuant to the UGIA.

The UGIA codifies in Utah law the concept of sovereign immunity, a principle that the state cannot be sued in its own courts without its consent. *See Madsen v. Borthick*, 658 P.2d 627, 629 (Utah 1983). The Utah Supreme Court calls it "a 'comprehensive chapter' containing 'waivers and retentions of immunity' that 'appl[y] to all functions of government' and 'govern[] all claims against governmental entities or against their employees or agents [under specific conditions].'" *GeoMetWatch*, 428 P.3d at 1069 (alterations in original) (quoting Utah Code § 63G-7-101(2)). Thus, "[u]nless immunity is waived by the [UGIA], 'each governmental entity and each employee of a governmental entity are immune from suit for any injury that results from the exercise of a governmental function.'" *Id.* (quoting Utah Code § 63G-7-201(1)).

By the plain terms of the statute, "'[g]overnmental entity' means . . . the state and its political subdivisions." Utah Code § 63G-7-102(4). Likewise, the term "state," as defined by the statute, means "the state of Utah, and includes each office, department, division, agency, authority, commission, board, institution, hospital, college, university, Children's Justice Center, or other instrumentality of the state." *Id.* § 63G-7-102(10). "Political subdivision," is defined as "any county, city, town, school district, community reinvestment agency, special improvement or taxing district, local district, special service district, an entity created by an interlocal agreement . . . or other governmental subdivision or public corporation." *Id.* § 63G-7-102(8).

GMW challenges the district court's findings that both AWSF and USURF are governmental entities under the UGIA, more specifically, as instrumentalities of Utah State University. GMW says that the entities are neither instrumentalities of the state nor public corporations. Aplt.'s Opening Br. at 90, 94. While the district court concluded that the two were instrumentalities of the state, it did not reach the question of whether they are public corporations. So here, we engage with the sole question the district court reached.

In responding to the district court's certification of certain state law questions, the Utah Supreme Court first laid out some definitions of "instrumentality": (1) "A thing used to achieve an end or purpose," *GeoMetWatch*, 428 P.3d at 1072 (quoting *Instrumentality*, BLACK'S LAW

81

DICTIONARY (10th ed. 2014)); (2) "A means or agency through which a function of another entity is accomplished, such as a branch of a governing body," *id.* (quoting *Instrumentality*, BLACK'S LAW DICTIONARY (10th ed. 2014)); (3) "A subsidiary branch, as of a government, by means of which functions or policies are carried out," *id.* (quoting *Instrumentality*, AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2016)); (4) "something that serves as an intermediary or agent through which one or more functions of a controlling force are carried out," *id.* (quoting *Instrumentality*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (14th ed. 2016)); and (5) "a part, organ, or subsidiary branch esp. of a governing body," *id.* (quoting *Instrumentality*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (14th ed. 2016)).

To determine whether an entity is an instrumentality of the state, the Utah Supreme Court advised the court to ask whether USURF and AWSF are "[1] branch[es] of the state that [2] carr[y] out state functions, and, if so, [3] whether [both entities] and [their] functions are 'of the same general kind, class, character, or nature as those enumerated' terms [found in the statute]." *Id.* at 1074 (quoting *State ex rel. A.T. v. A.T.*, 34 P.3d 228, 232 (Utah 2001)). Those "terms" are, namely, the state of Utah, and each office, department, division, agency, authority, commission, board, institution, hospital, college, university, and Children's Justice Center of the state. *See id.* at 1073. We find that USURF and AWSF satisfy all three prongs of this test as a matter of law.

82

To begin, it is not even clear that the question at the heart of this governmental immunity issue is one for the jury, rather than the court to decide. That is, GMW, as seen in the district court, attempts to generate an issue of material fact vis-à-vis whether AWSF and USURF are governmental entities; yet, that question is more than likely a legal question for the court. *See Amundsen v. Univ. of Utah*, 448 P.3d 1224, 1229–30 (Utah 2019) (noting that compliance with the UGIA is a prerequisite to subject matter jurisdiction and the question of whether a court has subject matter jurisdiction "presents a question of law" (quoting *In re Adoption of Baby E.Z.*, 266 P.3d 702, 706 (Utah 2011))); *Hall v. Utah State Dep't of Corr.*, 24 P.3d 958, 962 (Utah 2001) ("A trial court's decision to dismiss a case based on governmental immunity is a *determination of law* that we afford no deference." (emphasis added)); *cf. Peck v. State*, 191 P.3d 4, 6 (Utah 2008) ("[D]etermining the scope of an exception to the waiver of governmental immunity is *a question of statutory interpretation* that we also review for correctness." (emphasis added)).

In any event, regarding the first prong of the Utah Supreme Court's test (i.e., whether both entities are branches of the state), GMW argues that "USURF and AWSF cannot be instrumentalities of the state because they are not 'branches' of the state that carry out traditional state functions," but rather are, "[a]t their core . . . commercial entities separate from Utah State University, devoted to making money, and without any legislative oversight." Aplt.'s Opening Br. at 90.

83

In support of this position, GMW cites a February 2013 email from Defendant Robert Behunin, a USURF board member, in which he describes Utah State University, AWSF, and the State of Utah as "three distinct entities with corporate veils between them," and states that AWSF is "its own corporate entity," providing the State and Utah State University protection through its corporate veil. *Id.* at 90–91 (quoting Aplt.'s App., Vol. 5, at 1085 (Email from Robert Behunin, USURF, to Gene Pache, GMW, dated Feb. 7, 2013)). "Standing alone," says GMW, "this email creates a disputed fact regarding whether USURF and AWSF can be 'branches' of the state." *Id.* at 91.

We disagree. Both entities are branches of the state. Black's Law Dictionary defines "Branch" as "[a]n offshoot, lateral extension, or division of an institution." *Branch*, BLACK'S LAW DICTIONARY (10th ed. 2014). With that in mind, we note that the Utah legislature specifically granted Utah State University permission to create entities like USURF and AWSF. Utah Code § 53B-18-501 expressly states that Utah State University "may form nonprofit corporations or foundations . . . to aid and assist the university in attaining its charitable, scientific, literary, and educational objectives." Utah Code § 53B-18-501(1). That same code allows USURF to "receive and administer . . . government grants, contracts, and private gifts to carry out [its] public purpose." *Id.* § 53B-18-501(2).

84

Moreover, as USURF points out, it "is subject to public management and oversight at multiple levels"—not only by Utah State University, but also by the State Board of Regents, whose Policy R271 "recognizes USURF as a 'governmental entity for purposes of Board policy,'" "regulates how USURF operates through contracts, specifies the subjects and scope of the contracts[,] . . . and requires annual audits by an independent CPA."  USURF Defs.' Resp. Br. at 39–40 (quoting Aplt.'s App., Vol. 6, at 1103–04 (USURF Defs.' Reply in Supp. of Mot. for Partial Summ. J., filed Feb. 3, 2017)) (citing Aplt.'s App., Vol. 71, at 15369 (USURF's Suppl. Br. in Resp. to Ct.'s Order, filed Oct. 26, 2018)).

Similarly, AWSF is under the authority of Utah State University, with the latter "maintain[ing] control and oversight of AWSF by remaining the sole member and voting member of AWSF, retaining the right to remove any AWSF director at any time, and requiring approval of any AWSF officer or agents" under the Articles of Incorporation and Bylaws of AWSF.  AWSF Defs.' Resp. Br. at 33 (citing Aplt.'s App., Vol. 5, 886, 892–93 (AWSF Articles of Incorporation and Bylaws, dated Jan. 7, 2013, and Jan. 8, 2013, respectively)).  Indeed, the Utah Supreme Court briefly noted that "USURF and AWSF are both 501(c)(3) nonprofit corporations wholly owned or operated by [Utah State University]. . . . Additionally, both entities' founding boards are appointed by [the university]." *GeoMetWatch*, 428 P.3d at 1068.

As for the one email that GMW refers to—and upon which stands GMW's assertion that both entities are not "branches" of Utah State University—it is of no moment. In light of what Utah statutes have elucidated, we see no reason why this lone email from a USURF board member stating that "USU, [AWSF], and the State of Utah are three distinct entities," contradicts the very obvious notion that USURF and AWSF are branches of Utah State University.[16] Aplt.'s Opening Br. at 90. It could indeed be said they are three distinct entities under Utah Code § 63G-7-102(10), with Utah State University as a "university" of the State of Utah, and USURF and AWSF as separate and independent "branches" of that "university."

Put differently, GMW's assertion does not effectively challenge the conclusion that—as branches of Utah State University—both entities are instrumentalities of that institution, which is a governmental entity of the State of Utah. *Cf. Amundsen*, 448 P.3d at 1233 (applying the UGIA's one-year filing period to a lawsuit brought against the University of Utah and doctors in the university medical center because, among other reasons, "[a] patient who has received services at a University clinic—which operates under the University's name with signage that advertises itself as the University's clinic—and who then receives an itemization of services from the University health care system, cannot

---

[16] Note that GMW fails to explain how the email is relevant to USURF specifically, which is not mentioned in it.

credibly claim that she had no reason to inquire whether her treating physician might be a State employee"; and noting that such a conclusion was "seemingly obvious").

As to the second prong of the Supreme Court's test—i.e., whether both entities carry out state functions—GMW claims that AWSF and USURF "are primarily devoted to private, commercial enterprise—including building satellites to be launched into space to make a profit." Aplt.'s Opening Br. at 91. GMW asserts without any supporting authority that such an activity is "not a state function." *Id.* It argues further that, in situations like this, "courts find no immunity." *Id.* In other words, because "USURF and AWSF have entered into substantial contracts with private commercial entities . . . for profit," according to GMW, it follows that they cannot be instrumentalities of the state under the UGIA. *Id.* at 92.

Again, we disagree. USURF and AWSF both carry out state functions by assisting Utah State University in educational and scientific objectives. The Utah Supreme Court itself stated that "USURF and AWSF were incorporated to carry out the functions of USU." *GeoMetWatch*, 428 P.3d at 1068. As explained earlier, both entities were created pursuant to Utah Code § 53B-18-501, which permits Utah State University to "form nonprofit corporations or foundations . . . *to aid and assist* the university in attaining its charitable, scientific, literary, and educational objectives." Utah Code § 53B-18-501(1) (emphasis added). Were

87

that not obvious enough, both entities' articles of incorporation expressly provide that they were formed for the purpose of Utah State University's educational and research goals. Specifically, USURF's articles of incorporation state it was organized and wholly owned by Utah State University to:

> 1. Conduct research in areas deemed appropriate by the governing Board of Trustees of [USURF] and consistent with the charitable, scientific, literary, research, educational, and service goals of Utah State University.
>
> 2. Acquire and disseminate knowledge, support the education, research, and public service functions of Utah State University.
>
> . . . . [and]
>
> 7. Use or apply the whole, or any part of, resources generated by [USURF] exclusively for charitable, scientific, literary, research, educational, or service purposes to benefit [USURF] and Utah State University.

Aplt.'s App., Vol. 71, at 15389–90 (USURF Articles of Incorporation, dated Aug. 27, 2010). Similarly, AWSF's articles state that the entity's purpose is "[t]o benefit, perform the functions of, and carry out the purposes of Utah State University." *Id.*, Vol. 5, at 885.

Attempting to persuade us to the contrary, GMW ineffectively cites a Texas Court of Appeals decision, *Lenoir v. U.T. Physicians*, 491 S.W.3d 68 (Tex. Ct. App. 2016), and our prior opinion in *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702 (10th Cir. 2006), to argue that entities like USURF and AWSF do not carry out any state functions. *See* Aplt.'s Opening Br.

88

at 91–92. But both cases are inapposite. The former is largely irrelevant in the context of a Utah state law question, while the latter is factually inapposite and grapples with Eleventh Amendment sovereign immunity questions, rather than the state statutory and procedural questions at play here. We note that this is not the first time GMW has attempted to rely on inapposite and irrelevant cases. Before the Utah Supreme Court, GMW "cite[d] more than a dozen cases from other jurisdictions that deal with terms different than the ones that are at issue here." *GeoMetWatch*, 428 P.3d at 1070. "For example, many of the cases cited attempt to define 'arm of the state,' which is a term relevant for Eleventh Amendment immunity purposes." *Id.* "But the governmental immunity provided under the Eleventh Amendment is not coextensive with the coverage provided by the [UGIA]." *Id.* at 1070–71. Echoing the Utah Supreme Court, we find these two cited cases to be inapposite and irrelevant to our analysis.

Moreover, when we consider GMW's bare assertion that building and "[l]aunching weather satellites" for profit "is not a state function," the caselaw and the record establish that GMW's claim is incorrect, especially when applied to USURF and AWSF. Aplt.'s Opening Br. at 91. As a preliminary matter, caselaw tends to show that launching objects into the atmosphere and space is not an uncommon governmental undertaking. *Cf. Hughes Commc'ns Galaxy, Inc. v. United States*, 34 Fed. Cl. 623, 625–26 (1995) (narrating that NASA, as part of the functions of its "Division of Customer Relations," entered into a contract with

89

a private entity in which NASA agreed to launch the private entity's satellites);

*see also New Mexico State Univ. v. Winfrey*, No. 11-10-00213-CV, 2011 WL

3557239, at *1 (Tex. App. Aug. 11, 2011) (unpublished) (case centering on a

weather balloon owned and launched by New Mexico State University).

Furthermore, Utah State University is a space-grant university, meaning it

is a part of NASA's Space Grant program focusing on science, engineering,

research, and public outreach.  *See* Aplt.'s App., Vol. 71, at 15371.  Its mission

"is to be one of the nation's premier student-centered land-grant and space-grant

universities by fostering the principle that academics come first, by cultivating

diversity of thought and culture and by serving the public through learning,

discovery, and engagement."  *Id.*  Thus, launching weather satellites does indeed

comport with Utah State University's mission.  Indeed, as the district court

explained specifically with respect to USURF:

> USURF has advanced the education and research objectives
> stated in its articles of incorporation by giving students hands-on
> experience directly related to their fields of study in engineering
> and science.  About twenty percent of USURF's employees are
> students.  USURF also sponsors senior projects for engineering
> and science students, collaborates with faculty on research
> projects, funds scholarships, and provides a lecture series that
> allows faculty and students to hear the latest in space science
> engineering and technologies.  Finally, USURF employees teach
> at Utah State University as adjunct lecturers.

*GeoMetWatch*, 2019 WL 430886, at *4.

90

In that regard, we note that the district court distinguished AWSF from USURF since the former was founded only in 2013[17] specifically "to design and build a weather sensor for [GMW]." *Id.* at *5. But because AWSF was never fully funded due to GMW's failure to fund the project per the Build Agreements and other contracts, the court noted that AWSF "terminated its contract with [GMW]." *Id.* Consequently, that entity "has not produced evidence of concrete steps taken to further Utah State University's educational and research objectives." *Id.*

Nevertheless, we agree with the district court that AWSF's "lack of funding . . . does not alter its essential nature and purpose." *Id.* "Like USURF, [AWSF] was created to solve real-world engineering problems while giving students hands-on experience." *Id.* And perhaps more crucial to this appeal, GMW does not proffer any argument specifically challenging this finding regarding AWSF's mission. *See Nixon*, 784 F.3d at 1366; *see also Bronson*, 500 F.3d at 1104 ("[T]he omission of an issue in an opening brief generally forfeits appellate consideration of that issue."). In sum, in our view, AWSF's lack of "real-world" evidence showing how it fulfills its mission is not dispositive here. Thus, we conclude that both USURF and AWSF were designed to assist and perform the functions of Utah State University. We reject GMW's assertions to the contrary.

---

[17]    USURF was founded in 1967.

And on the third prong, that is, whether both entities' functions are of the same general kind, class, character, or nature as those enumerated entities in Utah Code § 63G-7-102(10), GMW first lists those entities' "core characteristics" which include, in GMW's view, "(1) the legislature almost always explicitly creates them; (2) statutes describe and prescribe their powers; (3) statutes dictate their organizational structure; (4) they almost exclusively carry out traditional state functions; and (5) statutes dictate their funding and budgeting mechanisms." Aplt.'s Opening Br. at 93 (emphases omitted) (footnotes omitted). GMW argues that USURF and AWSF lack these characteristics, thereby distinguishing them from § 63G-7-102(10) entities. Specifically, GMW explains that both entities "were created by [Utah State University]," "have powers governed by legal documents," "have organizational structures dictated by bylaws and articles of incorporation," "carry out commercial activities for profit," and "have unlimited ability to enter into commercial contracts." *Id.* at 93–94.

But this argument is meritless. As we have previously discussed, both entities were created pursuant to a Utah *statute* enabling Utah State University to create such entities. Utah State University—a governmental entity itself—and its officials created, organized, and have the power to appoint USURF and AWSF officers. The entities' purposes include supporting and supplementing Utah State University's functions, specifically, its educational and research mission. That fact is crucial. As the district court noted, the inclusion of "university" amongst

92

the terms enumerated in § 63G-7-102(10) "indicates that the catch-all phrase 'other instrumentality of the state' is at least broad enough to include entities that are similar to state institutions of higher education." *GeoMetWatch*, 2019 WL 430886, at *6.

In that regard, both entities were surely created to further Utah State University's goals as branches of that university and are logically of the same kind, class, character, or nature as their parent institution. *See GeoMetWatch*, 428 P.3d at 1074 ("determining whether an entity qualifies as an 'other instrumentality of the state' requires a comparison between that entity's specific characteristics and those of the twelve enumerated terms [which includes the term 'university'], keeping the dictionary definitions of the enumerated terms in mind"). Thus, we conclude that USURF and AWSF have functions that are of the same kind, class, character, or nature as the university that they are part of.

In sum, all three prongs discussed by the Utah Supreme Court in *GeoMetWatch*, 428 P.3d at 1074, establish that USURF and AWSF are branches of Utah State University serving to further its educational and research goals and having functions similar to the university. Accordingly, we hold that the two entities are instrumentalities of the State of Utah and covered by the UGIA. We thus uphold the court's decision to grant summary judgment in favor of USURF, AWSF, and Mr. Roberts, who was employed by the entities.

## C

We finally turn to GMW's last issue in this appeal: whether the district court erred in granting partial summary judgment to AWSF on its counterclaim for breach of contract while rejecting GMW's affirmative defenses and cross-motion for summary judgment.

GMW puts forward four theories that purportedly bar AWSF's counterclaim: (1) a fraudulent inducement defense; (2) a first breach defense; (3) a damages offset; and (4) a contractual limitation of damages. Going through each of them, we find that GMW's assertions are either waived or unavailing, much like many of its previous arguments.

### 1

GMW avers that the district court erred in rejecting its fraudulent inducement defense because GMW "presented evidence that AWSF made a material misrepresentation regarding the [PPA and Build Agreements], namely, that AWSF would amend the contracts to extend the deadline for [GMW's] payments to accommodate the EXIM loan funding when AWSF knew it would not do so." Aplt.'s Opening Br. at 97–98 (citing Aplt.'s App., Vol. 76, at 16531–33). GMW purports that AWSF's misrepresentation was material because GMW relied on AWSF's promise that it "would extend the payment deadlines." *Id.* at 98 (citing Aplt.'s App., Vol. 83, at 18220 (AWSF email to GMW, sent Sept. 3, 2013)). Specifically, in an email, AWSF told GMW that, "[i]f funding does not

94

come in time, we will be required to modify the contract.  It would not be our intent to assert 'breach,' but we could only take that position for a limited period of time (certainly not indefinitely)."  Aplt.'s App., Vol. 83, at 18220.  Another email from GMW discusses a supposed oral representation from those associated with the AWSF deal to GMW that AWSF would "extend the contract as necessary."  *Id.* at 18304 (GMW email to Robert Behunin, sent Jan. 28, 2014).  And on that note, GMW further alleges that it only signed the STORM 001 Contract because AWSF promised that it would amend it to "say[] that this contract is based on EXIM funding, that nothing in this contract will take place until EXIM funding is granted and [GMW] ha[s] it in hand."  *Id.* at 18264 (Eugene Pache Dep. Tr., dated May 10, 2016).

GMW concludes by stating that AWSF's misrepresentation induced GMW to make the contract and GMW was justified in its reliance.  Aplt.'s Opening Br. at 97, 99.  Thus, according to GMW, the district court "should have drawn the inference from these facts that AWSF intended to replace [GMW] with [Mr.] Hall, and induced [GMW] to sign the contracts so [Mr.] Hall could assume [GMW's] role when AWSF terminated the contracts."  *Id.* at 100.

GMW explains that "[a] contract is voidable for fraud if four elements are met: (1) there is a misrepresentation; (2) the misrepresentation was either fraudulent or material; (3) the misrepresentation induced the recipient to make the contract; and (4) the recipient was justified in relying on the misrepresentation."

95

Aplt.'s Opening Br. at 97 (citing *Miller v. Celebration Mining Co.*, 29 P.3d 1231 (Utah 2001)).[18]

The record contradicts GMW's assertions about AWSF's so-called "material misrepresentation." There is simply no evidence—either direct or circumstantial—that AWSF made the representations at issue with an intent to disregard them. GMW itself does not aid its contention, failing to cite anything in the record that would show how AWSF's representations were made with intentional falsity. Indeed, GMW's ultimate theory as to why AWSF intended to materially misrepresent the prospects of a contract extension is absurd and rendered false when the record is examined. According to GMW, AWSF conspired with the Hall Defendants to cause GMW to breach its agreements with AWSF so that AWSF could terminate those agreements and permissibly enter into similar contracts with Mr. Hall. *See* Aplt.'s Opening Br. at 100.

However, as the district court wrote, "[i]t defies plausibility that AWSF wanted to execute enforceable Build Agreements while simultaneously intending to lure [GMW] into materially breaching those agreements three months later in order to terminate them . . . . Clearly, AWSF could have achieved that aim—if it

---

[18]    At the district court, the parties disagreed on the correct standard to use in evaluating GMW's affirmative defense. *See GeoMetWatch*, 2019 WL 3937023, at *4. In this appeal, however, "AWSF does not dispute the applicable standard because [it reasons that] GMW fails to meet its own proposed test," which shares certain elements with AWSF's proposed test presented to the district court. AWSF Defs.' Resp. Br. at 49 n.27.

existed at the time of contracting—by declining to execute the agreements in the first place." *GeoMetWatch*, 2019 WL 3937023, at *5. It is indeed unreasonable to infer that AWSF would go through all the trouble to induce GMW to sign the PPA and Build Agreements only for it to dump GMW for Mr. Hall and Tempus, when it could just decide to shun any deal with GMW in the first instance. This is essentially the type of "unreasonable" inference based on speculation, guesses, and mere possibility, that we disregard at the summary judgment stage. *Pioneer Ctrs.*, 858 F.3d at 1334; *cf. Roe v. Cheyenne Mountain Conf. Resort, Inc.*, 124 F.3d 1221, 1235 (10th Cir. 1997) ("We view the evidence and make all *reasonable* inferences therefrom in the light most favorable to the party opposing summary judgment." (emphasis added)).

In any event, the sequence of events as gleaned from the record fully shuts the door on the theory's reasonableness. As narrated above, Mr. Hall was introduced to GMW on September 20, 2013, by GMW's own attorney. The first agreement AWSF signed with GMW—the PPA—was executed on September 19, 2013, just one day before Mr. Hall was introduced to GMW. And the email stating that AWSF would extend payment deadlines if necessary was sent on September 3, 2013. Thus, in light of the record, GMW's arguments regarding fraudulent inducement are chronologically impossible. It could not be AWSF's intent to provide false information to GMW for Mr. Hall's benefit when he was

not a part of negotiations (or even present as a party in the whole saga) when AWSF and GMW entered into the PPA.

Additionally, we find waived any argument that GMW may have as to whether the district court erred in finding that GMW did not justifiably rely on any alleged misrepresentation. This is because GMW merely offers a conclusory, contrary claim that the misrepresentations induced GMW to enter into the contracts and it justifiably relied on those misrepresentations. Aplt.'s Opening Br. at 97, 99. Nothing else. We find the bald assertion inadequately briefed and thus waived. *See Pilatus*, 582 F.3d at 1142; *Exum*, 389 F.3d at 1133 n.4; *Adler*, 144 F.3d at 679.

Similarly, GMW offers no rebuttal to the district court's additional reasons for rejecting its fraudulent inducement defense. The court rightly pointed out that, even if GMW relied on these representations, such reliance was unreasonable, given that AWSF and GMW were sophisticated entities that thoroughly negotiated the Build Agreements and the PPA. *See GeoMetWatch*, 2019 WL 3937023, at *5–6.

In light of this context—not to mention the more than $100 million at stake—GMW cannot excuse its failure to perform by pointing to alleged oral promises made by AWSF during the negotiations that did not make their way into the final, written contracts. *See id.*; *cf. Semenov v. Hill*, 982 P.2d 578, 581 (Utah 1999) (noting that the sophistication of contracting parties, which includes

98

English language proficiency, is material to a fraud claim); *Conder v. A.L. Williams & Assocs., Inc.*, 739 P.2d 634, 638 (Utah Ct. App. 1987) ("If plaintiff can claim reliance on the basis of the kind of statement on which no reasonable person would rely for one reason or another, then it is quite likely that plaintiff did not rely [on that statement] and if his testimony that he did is allowed as sufficient evidence on the basis of which a finder of fact can find reliance, then it will be too easy for a party to a contract to escape the consequences of his own bad judgment in making a bargain of some kind." (quoting William Prosser & W. Page Keeton, THE LAW OF TORTS § 108 749–50 (5th ed. 1984))); *cf. also Burningham v. Westgate Resorts, Ltd.*, 317 P.3d 445, 451 (Utah Ct. App. 2013) ("[S]ophisticated business parties are charged with knowledge of the terms of the contracts they enter into." (quoting *ASC Utah, Inc. v. Wolf Mountain Resorts, LC*, 245 P.3d 184, 193 (Utah 2010))).

Moreover, GMW has not even argued that its breach of the Build Agreements was somehow caused by or related to the alleged fraudulent misrepresentations.  In other words, GMW's failure to remit its first payment to AWSF was unrelated to the execution of the contracts themselves.  And, beyond this, GMW has offered nothing beyond unfounded, rank speculation to support the notion that it would have been able to remit that payment at some future date.

99

Thus, GMW's unsupported and implausible fraudulent inducement defense does not defeat AWSF's counterclaim, and the district court did not err in rejecting it and granting AWSF summary judgment.

**2**

Next, GMW contends that the trial court erred by finding that AWSF did not initially "breach the Build Agreements" before GMW did. Aplt.'s Opening Br. at 101. GMW notes that it "alleged in its Third Amended Complaint that AWSF breached the PPA." *Id.* at 102. GMW continues that it "consistently alleged through the litigation that AWSF breached the confidentiality . . . and the exclusivity provision[s] of the PPA." *Id.* For support, GMW merely cites the Third Amended Complaint, the PPA, and its briefing before the district court, which contains sparse references to the record, the materiality of which are not explained in GMW's appellate briefs. *See id.*

In light of the insufficient way GMW chose to brief this argument before us, it is likely that GMW has waived any challenge as to its "first breach" defense. But we formally need not reach that conclusion since GMW's argument is flatly incorrect—viewed in the light of GMW's *own* conclusory words and references. Specifically, GMW claims that it was AWSF who breached the Build Agreements. But GMW then goes on to argue that AWSF breached *the PPA*. GMW never explains why breaching the PPA is tantamount to breaching the Build Agreements. The district court noted the same inconsistency. *See*

100

*GeoMetWatch*, 2019 WL 3937023, at *11. And it is telling that GMW again completely ignores the district court's analysis—perhaps because there is nothing in the record that shows AWSF did in fact breach the Build Agreements.

Thus, we find that GMW anchored its "first breach" defense on an allegation of AWSF's breach of the wrong contractual agreement, while citing seemingly irrelevant and unexplained documents in the record. We thus conclude this argument is both unconvincing and insufficiently briefed to warrant any further review.

**3**

GMW claims that the district court erred in determining "that AWSF was entitled to $39,030.44 for costs it incurred *after* execution of the contracts, i.e., the costs AWSF incurred in October 2013." Aplt.'s Opening Br. at 103 (citing *GeoMetWatch*, 2019 WL 3937023, at *7–9). As GMW reasons, the court's decision was erroneous because it "ignored the undisputed fact that [GMW] offset the costs AWSF incurred post contract formation *by paying AWSF $250,000* in September and October 2013." *Id.*

This argument likewise fails at the outset and upon further inspection. GMW, again, ignores—or perhaps avoids—the district court's reasoning as to why it declined to reduce AWSF's award. The court noted that GMW's offset payments "have already been used to reduce AWSF's damages by enabling AWSF to avoid expenditures it would have been forced to incur in their absence."

101

*GeoMetWatch*, 2019 WL 3937023, at \*10.  Accordingly, "[t]he court can discern no principle for, in essence, deducting $250,000 from AWSF's damages twice." *Id.*  And indeed, AWSF did not seek to recover expenditures that the $250,000 offset payment covered.  *See id.*; AWSF Defs.' Resp. Br. at 55–56.

Despite the court's clear reasoning, GMW in this appeal fails to provide a direct rebuttal to persuade us that AWSF's award should have been reduced further in light of the offset payment.  Even in the context of pro se litigants, "[t]he first task of an appellant is to explain to us why the district court's decision was wrong." *Nixon*, 784 F.3d at 1366.  It necessarily follows that GMW was obliged to carry this burden here, and it failed to do so.  That is, GMW's inadequate briefing and failure to even argue against the court's clear conclusions and reasoning leaves us nothing to review as to its claim that it already offset AWSF's damages.  We therefore reject GMW's argument as both unpersuasive and inadequately briefed.

**4**

Lastly, GMW argues that the district court erred by ignoring the PPA and Build Agreements' "damage limitation provisions . . . on which [AWSF's] counterclaim is based," which would "bar AWSF from recovering its damages as a matter of law."  Aplt.'s Opening Br. at 105.  As GMW sees things, the "only damages AWSF seeks on its counterclaim are consequential damages which are barred by the contracts." *Id.* at 106.  "AWSF's alleged damages are consequential

damages," says GMW, "because they were the losses caused by the 'absence of [GMW's] performance.'" *Id.* (quoting *Trans-W. Petroleum, Inc. v. United States Gypsum Co.*, 379 P.3d 1200, 1207 (Utah 2016)). "Had [GMW] made those payments, the expenses incurred by AWSF would have been recouped (and then some) as it worked to manufacture the sensor." *Id.* at 107.

Damages for breach of contract generally include "general damages, *i.e.*, those flowing naturally from the breach, and consequential damages, *i.e.*, those reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 801 (Utah 1985). "[C]onsequential damages 'mean[ ] particular items of damages which result from circumstances peculiar to the case at hand.'" *Trans-W. Petroleum*, 379 P.3d at 1207 (second alteration in original) (quoting *Prince v. Peterson*, 538 P.2d 1325, 1328 (Utah 1975)). Put differently, consequential damages are "the natural, but not *necessary*, result of an injury." *Id.* (emphasis added) (quoting *Cohn v. J.C. Penney Co.*, 537 P.2d 306, 308 (Utah 1975)). General and consequential damages have traditionally been considered to be two different types of expectation damages which is "the amount necessary to 'place the nonbreaching party in as good a position as if the contract *had been performed*.'" *Alta Health Strategies, Inc. v. CCI Mech. Serv.*, 930 P.2d 280, 284-85 (Utah Ct. App. 1996) (emphasis added); *see also Trans-W. Petroleum*,

379 P.3d at 1206 ("Our courts have alternatively, but equally correctly, defined expectation damages as including" general damages and consequential damages.).

On the other hand, "damages based on an [injured party's] reliance interest" are "[e]xpenditures made *in preparation for performance or in performance*, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." RESTATEMENT (SECOND) OF CONTRACTS § 349 (1981) (emphasis added) [hereinafter "RESTATEMENT (SECOND)"].  In other words, "reliance damages" are "damages to return the plaintiff to the position the plaintiff enjoyed *before* relying on the promise." *Richards v. Brown*, 222 P.3d 69, 83 (Utah Ct. App. 2009) (emphasis added), *aff'd* 274 P.3d 911 (Utah 2012); *see also Trans-W. Petroleum*, 379 P.3d at 1206 n.11 (explaining that "the remedy for breach of a contract in general . . . is not limited to expectation damages.  *Other* potential remedies may include substitution performance costs and *reliance damages*." (emphases added)); *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 837–41 (10th Cir. 2016) (applying Colorado law to permit recovery of reliance damages but not lost profits deemed to be consequential damages); *see also GeoMetWatch*, 2019 WL 3937023, at *10 (explaining that "[t]he elusive distinction between general and consequential damages typically arises only in breach of contract actions seeking expectation damages, and there appears to be no Utah case applying these concepts to the recovery of reliance damages," but "the court has

104

little trouble concluding that AWSF's damages do not fall into the handful of damages categories deemed consequential, special, or indirect" because reliance expenditures in this matter were "'necessary' to perform under the Build Agreements," "AWSF does not seek damages that are 'secondary' to the Build Agreements," and there is "nothing 'peculiar' or 'unique'" about the claimed damages).

As damages for its breach of contract counterclaim, AWSF sought recovery of the payroll and operational expenses it incurred as start-up costs for its venture with GMW.  *See* AWSF Defs.' Resp. Br. at 57.  In other words, it sought to recover for "[e]xpenditures made *in preparation for performance or in performance*."  RESTATEMENT (SECOND)*, supra*, § 349 (1981) (emphasis added).  The district court characterized these expenses as "reliance damages," *see GeoMetWatch*, 2019 WL 3937023, at *7; this comports with Utah caselaw.  By recovering its initial expenditures in preparation for building the STORM sensor, AWSF is restored to its position prior to entering into the Build Agreements with GMW—or in other words, prior to its reliance on GMW's promise to pay.  Characterizing these expenditures as "reliance damages" is correct, and GMW fails to advance a convincing argument to the contrary.

In essence, GMW makes a circular argument that, because its own breach deprived AWSF of anticipated profits from the STORM sensor, and because those lost profits may have allowed AWSF to recoup its initial outlay of payroll and

operational expenditures, AWSF is really seeking consequential damages, and therefore cannot recover its damages based on the language of the Build Agreements.  This argument is meritless.

*** 

In sum, we find that the district court properly rejected GMW's affirmative defenses and awarded AWSF summary judgment.  GMW's fraudulent inducement defense fails because there is no evidence that AWSF sought to induce GMW to enter into the PPA and Build Agreements with the intent to cancel the contracts in favor of Mr. Hall later on.  GMW's first breach defense fails because there is no evidence that AWSF was the first to breach the Build Agreements.  GMW's damages offset claim is meritless because it fully avoids the district court's reasoning and fails to establish that the $250,000 GMW paid AWSF offset the damage award that the district court granted.  And, lastly, GMW fails to persuade us that AWSF's damages are consequential damages barred by the PPA and Build Agreements.  Thus, we reject GMW's appeal on these issues.

## IV

In ending our resolution of this appeal, we address certain pending motions. There are three motions to seal pending in this appeal.  Namely, GMW's December 12, 2019, motion to seal portions of the Opening Brief and the Appendix, Defendants' June 11, 2020, motion to seal their Briefs, and GMW's August 4, 2020, motion to seal its Reply Brief.  Defendants in particular state that

106

they oppose GMW's motions to seal, but nevertheless, "out of an abundance of caution," request us to seal their Briefs if we find merit in GMW's assertions. *See* Aplees.' Mot. to Seal Briefs at 2.  We **deny** all these motions.

Under Rule 25.6 of our local rules, "[a]ny party who seeks to file any document under seal . . . must overcome a presumption in favor of access to judicial records."  10th Cir. R. 25.6; *see also Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1135–36 (10th Cir. 2011) (discussing the "heavy burden" a movant must carry to overcome this presumption).  In seeking to overcome this presumption, motions for leave to file under seal must do the following: (1) "identify with particularity the specific document containing the sensitive information"; (2) "explain why the sensitive information cannot reasonably be redacted in lieu of filing the entire document under seal"; (3) "articulate a substantial interest that justifies depriving the public of access to the document"; (4) "cite any applicable rule, statute, case law, and/or prior court order having a bearing on why the document should be sealed, keeping in mind that this court is not bound by a district court's decision to seal a document below"; and (5) "comply with Tenth Circuit Rule 27.1 [outlining requirements for motions]."  10th Cir. R. 25.6(A)(1)–(5).  Moreover, because "[r]edaction is preferable to filing an entire document under seal," "the party seeking to protect sensitive information shall publicly file a redacted version of the document

107

concurrently with the motion to seal," "unless redaction is impracticable." 10th Cir. R. 25.6(B).

As with its merits briefing in this case, GMW's motions to seal portions of its Briefs and Appendix are deficient and unconvincing. GMW fails to show—and fails to even argue—why redaction in lieu of sealing does not adequately protect any privacy interests it may have in certain portions of the record. In making its "wholesale request to seal," then, GMW "overlooks our presumption in favor of the 'common-law right of access to judicial records.'" *United States v. Camick*, 796 F.3d 1206, 1213 n.5 (10th Cir. 2015) (quoting *JetAway Aviation, LLC v. Bd. of Cnty. Comm'rs*, 754 F.3d 824, 826 (10th Cir. 2014)).

In addition, GMW's filings lack the requisite particularity to carry its burden. GMW was given two opportunities, via supplemental briefs, to demonstrate its substantial interest in depriving the public of access to these documents and in showing why redaction is infeasible beyond being time-consuming. *See* 10th Cir. Order at 3, Dec. 16, 2019; 10th Cir. Order at 2–3, Jan. 8, 2020. Yet GMW has continued to rely on generalities and speculation, along with unfounded fears that, somehow, Defendants will be able to use our disposition as preclusive on the issue of whether certain of GMW's materials are trade secrets or otherwise confidential. Simply put, GMW bears the burden of overcoming our public-access presumption. Its underlying motion and

108

supplements have failed to carry that burden.  Accordingly, we deny GMW's and Defendants' motions.

## V

For the reasons discussed in this opinion, we find all of GMW's arguments either waived or unavailing.  As a result, we **AFFIRM** the district court's judgment in this case.